**Joshua Seth OWENS, by His Guardian Ad Litem, Sandra Drury OWENS, Appellee,**

**and**

**Palmer Lee Owens, Sandra Drury Owens, Plaintiffs,**

v.

**BOURNS, INC., Appellant,**

**and**

**General Medical Corporation, Defendant,**

**American Academy of Pediatrics, Amicus Curiae.**

No. 83–2059.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 6, 1985.

Decided June 27, 1985.

Rehearing and Rehearing En Banc Denied July 30, 1985.

---

Joseph E. Elrod, III, Greensboro, N.C. (J. Reed Johnston, Jr., Tuggle Duggins Meschan & Elrod, P.A., Greensboro, N.C., Robert G. Byrd, Chapel Hill, N.C., Burton Craige, Professor of Law, University of North Carolina, Raleigh, N.C., on brief), for appellant.

Donald R. Harris, Chicago, Ill. (Richard L. Verkler, Jenner & Block, Chicago, Ill., on brief), for amicus curiae.

Richmond G. Bernhardt, Jr., Greensboro, N.C. (Stephen W. Earp, Smith Moore Smith Schell & Hunter, Greensboro, N.C., on brief), for appellee.

Before WINTER, Chief Judge, WIDENER, Circuit Judge, and KELLAM, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

HARRISON L. WINTER, Chief Judge:

This tragic case involves a claim by plaintiffs Joshua Owens and his parents alleging that Joshua Owens' blindness was caused by the defective design of defendant's infant ventilator equipment. The district court denied defendant's motion for a directed verdict, and a jury awarded plaintiffs a judgment of $1,500,000. Defendant, Bourns, Inc., manufacturer of the ventilator equipment, appeals from the district court's denial of its post-trial motions for a judgment notwithstanding the verdict or for a new trial.[1] Because we conclude that plaintiffs' evidence of causation was legally insufficient to permit a jury to decide the

---

**1.** Bourns makes several additional assignments of trial error on evidentiary and jury instructions matters. Because we hold that there was insufficient evidence of causation to support the judgment, we do not reach these other issues.

issue of liability, we reverse and direct the entry of judgment for defendant.

## I.

The theory of plaintiffs' cause of action is that because of the negligent design of Bourns' ventilator equipment, Joshua received concentrations of oxygen greatly in excess of those prescribed by his doctors, and that as a result he suffers from retrolental fibroplasia (RLF) blindness.

Joshua did not start life well. Born on March 22, 1977, his gestational age was approximately three months less than full term. His birth weight was a little under 2 pounds. Like many premature babies, he suffered from respiratory distress syndrome, a condition in which the lungs are unable to function properly without assistance. To sustain his life and to avoid brain damage, he required the assistance of the Bourns equipment, which supplied him with supplemental oxygen. He was also transferred from the hospital in which he was born to the neonatal intensive care nursery at North Carolina Memorial Hospital.

Joshua received supplemental oxygen for more than two months. The oxygen needs of a severely premature baby put him at great risk. Without supplemental oxygen he is likely to suffer brain damage or die. On the other hand, the administration of supplemental oxygen has its risks. The blood vessels in a premature baby's retinas are immature and undeveloped. It is widely accepted medical theory that for such babies, particularly given a low birth weight, levels of oxygen above those found in utero may constrict or close the blood vessels. This constriction starves the retina of oxygen, leading to the quick and uncontrolled growth of new blood vessels. Usually this process stops before significant eye damage occurs, but it may continue, leading to retinal scarring and detachment, and causing blindness. ..

At the neonatal intensive care nursery, Joshua was placed on a Bourns LS104–150 infant ventilator and a Bourns LS145 oxy-

gen blender. The blender mixes room air with 100% oxygen to create a gas with a prescribed oxygen concentration. The ventilator delivers this blended gas to the baby by a tube called the "inspiratory line." Exhaled gas travels though an "expiratory line" to the back of the ventilator and into the room. At the back of the ventilator, the positive end expiratory pressure (PEEP) assembly serves to maintain positive pressure in the baby's lungs to prevent lung collapse on exhalation. The PEEP assembly is powered by 100% oxygen. While that 100% oxygen is normally kept from the baby, another component of the PEEP assembly, the Sensitivity/Leak Compensator (SLC) valve allows a flow of 100% oxygen to bypass the PEEP assembly and to enter the expiratory line to compensate for leakage in the line. Joshua alleges that this assembly, while set according to Bourns' operating instructions, could and did deliver dangerously high levels of oxygen in excess of the levels prescribed by his doctors.[2]

Joshua's doctors tried to keep the oxygen level in his arterial blood (or PaO–2) within a range of 50 to 80 millimeters of mercury. They monitored his PaO–2 level several times a day by drawing blood samples for an arterial blood gas analysis. A blood gas analysis yields a PaO–2 value for the moment when the blood sample was taken. A person's PaO–2 level may change dramatically from moment to moment, however. At the time of Joshua's birth, the means to monitor PaO–2 levels continuously were unavailable.

On the morning of April 4, 1977, a respiratory therapist came on duty at 7:00 a.m. and, consistent with defendant's operating instructions, opened the SLC valve on Joshua's ventilator. At about 9:00 a.m., a blood sample was taken and revealed a PaO–2 of 215, dramatically above the target range. Notified of this result, Mr. R. Bruce Steinbach, the head of respiratory therapy, had Joshua removed from the ventilator. A

---

**2.** Although defendant does not concede that the design was defective, it does not contend on appeal that there was insufficient evidence for a jury to decide the question of negligent design.

second blood gas sample taken at this time revealed a PaO-2 of 240.

Upon arrival at the nursery on the morning of April 4, Mr. Steinbach tested the Bourns equipment, from which the nursery staff had by then disconnected Joshua, and found that the ventilator was delivering a gas with an oxygen concentration of 80% or more instead of the 24% for which the blender was set.[3] He then turned the SLC valves on all Bourns ventilators in the nursery to the off position. The nursery staff then reconnected Joshua to the Bourns equipment without incident.

Joshua is totally blind. Dr. Richard Epes, Joshua's ophthamologist, states that he suffers from one of the worst cases of RLF blindness that he has ever seen. Plaintiffs contend that the April 4 incident of hyperoxia contributed to Joshua's RLF blindness and would not have occurred if defendant's equipment had functioned properly.[4]

## II.

On the issue of causation, plaintiffs relied primarily on the testimony of two medical experts, Dr. Ernest Kraybill and Dr. Gerald Rogell. Defendant offered its own medical experts, who described somewhat differently from plaintiffs' experts the general theory of the etiology of RLF blindness.[5] These differences of medical opinion do not form the basis of defendant's contention that the causation evidence was insufficient. Rather, defendant contends that plaintiffs' causation evidence

was insufficient because the conclusion plaintiffs' experts stated, that the April 4 episode of hyperoxia probably contributed to Joshua's injury, was inconsistent with the rest of their testimony.

Both of plaintiffs' experts concluded that the April 4 episode of hyperoxia, either alone or in combination with other episodes of hyperoxia, was probably a cause of Joshua's injury. Dr. Rogell further stated that the April 4 episode coupled with a PaO-2 reading of 170 on March 30, 1977, which plaintiffs also attribute to defendant's negligence, were probably causally related to Joshua's RLF blindness. Both based their conclusions on medical research and data linking excessive oxygen causally to RLF, and particularly to the triggering of the initial stage of RLF. They stated that oxygen is the only cause that has been clearly identified, and that all babies who have suffered RLF have had some injury to their retinal blood vessels that is traceable to oxygen. Both doctors stated that oxygen toxicity is a necessary factor in the development of RLF blindness.

Yet much of Dr. Kraybill's and Dr. Rogell's testimony, while consistent with the medical theory that excessive oxygen causes RLF, undermined their conclusion that the particular incidents of excessive oxygen that plaintiffs blame on defendant were probably causally related to Joshua's injury. Plaintiffs' experts testified that scientists do not know how much oxygen or what length of exposure causes the constriction or destruction of the retinal blood

---

3. Defendant contests the validity of Mr. Steinbach's tests and particularly questions the reliability of any test performed while Joshua was disconnected from the equipment. At trial, defendant also offered two expert witnesses who testified that the equipment was not defective.

4. Although plaintiffs' evidence focused on the April 4 incident, one of plaintiffs' medical experts testified that a PaO-2 value of 170 occurring on March 30 was higher than Joshua could have had if he was receiving the oxygen concentration that his blender was set for. There were 19 other PaO-2 readings of 100 or more. Although plaintiffs assert that these were also attributable to defendant, they never offered any evidence to support this contention.

5. These differences in medical theory raise issues of the weight of expert testimony properly left for the jury. In its amicus curiae brief, the American Academy of Pediatrics similarly challenges some of the medical assumptions of plaintiffs' experts and offers its own description of the state of current medical knowledge regarding the causes of RLF blindness. It is not our task to evaluate competing medical theories, nor are we equipped to do so. Further, the sole issue before us is the sufficiency of the evidence *presented at trial* to raise an issue of causation for the jury. Other medical evidence or opinion is not relevant to that inquiry.

vessels. Dr. Kraybill stated, for instance, that "[o]xygen is related to the development of retrolental fibroplasia but the exact level of oxygen which is required, the duration of time that is required for oxygen to have that effect, has not been discovered." Both doctors also conceded that any level of oxygen concentration above that found in utero[6] may cause RLF in premature babies, though they added that the probability of harm increases as PaO–2 values climb above the 80 to 100 range. Dr. Rogell stated:

> With the current state of medical knowledge, it's impossible to look at any one episode and say, this is the one that made the difference. Based on what we know about RLF and based on what we know in general about toxic exposure, we know that the higher the concentration of the toxic agents and the longer you're exposed to it, the greater the chance that you'll suffer damage from it. So, in answer to your question, I would say that any episode, to the extent that any particular episode involved a high concentration and to the extent that that high concentration lasted for a period of time, that was more significant than an exposure that was not as high concentration and didn't last as long.

Dr. Rogell's and Dr. Kraybill's testimony indicated that hyperoxia's role is limited to the initial, or triggering, stage of RLF; continuing exposure to excessive oxygen plays no known role in the disease's further development. Thus, once exposure to excessive oxygen has triggered the disease process, scientists cannot say that any subsequent exposure furthers that process or aggravates the harm.

The evidence at trial showed that Joshua's April 4 elevated PaO–2 levels were but two of many such readings taken while he was at the nursery. In all, Joshua's medical records showed fifty separate occasions when his PaO–2 level was 80 or above. Of these, twenty-two readings showed levels of 100 or above, only two of which occurred on the morning of April 4. Yet plaintiffs offered no evidence linking to the Bourns equipment any of these elevated PaO–2 levels besides those achieved on March 30 and April 4.[7] Further, because the technology was not available to monitor Joshua's PaO–2 levels continuously, he may have experienced countless other incidents of elevated PaO–2 levels that went unrecorded.

The trial testimony also showed that Joshua received high concentrations of oxygen from sources other than the Bourns equipment. He received 100% oxygen while in transit to North Carolina Memorial Hospital.[8] Moreover, on numerous occasions, usually for brief periods, the nursery staff administered oxygen to Joshua manually, by a process called hand bagging. Although somewhat ambiguous, trial testimony indicated that at least once, and possibly regularly, the nursery staff used 100% oxygen during hand bagging.

### III.

■ Even under diversity jurisdiction the sufficiency of the evidence to create a jury question is a matter governed by federal law. *Fitzgerald v. Manning,* 679 F.2d 341, 346 (4 Cir.1982). Medical opinion evidence must express "a 'reasonable degree

---

**6.** According to Dr. Kraybill, medical science presumes that the range of normal PaO–2 values for a fetus in utero is 22 to 25. Exposure to room air will produce higher PaO–2 values.

**7.** Dr. Kraybill testified that Joshua's PaO–2 level of 170 on March 30 represented a value higher than that which Joshua could have experienced had the ventilator delivered the gas concentration for which the blender was set that day, 29% oxygen. Two earlier readings of 190 recorded on March 22 and March 27 may similarly have exceeded the maximum levels obtainable ac-

cording to Dr. Kraybill's formula had the Bourns equipment functioned properly, though whether or not they did depended on the blender settings on those occasions. However, plaintiffs offered no evidence regarding these readings.

**8.** At oral argument, plaintiffs' counsel contended that a newborn premature infant's lung capacity is so small that only a small portion of the oxygen administered to Joshua en route to the hospital could have entered his bloodstream.

of medical certainty' that it was more likely that the defendant's negligence was the cause than any other cause" for that evidence to be sufficient to go to the jury. *Id.* at 350. Additionally, medical opinion that is inconsistent with the entirety of an expert's testimony is not sufficient to raise a jury question. While we are mindful that we must view the evidence in the light most favorable to plaintiffs and give them the benefit of all reasonable inferences that a jury might have drawn, we do not believe that plaintiffs' evidence of causation was sufficient under the *Fitzgerald* standard to raise an issue for the jury.

■ Accepting as we must Dr. Kraybill's and Dr. Rogell's testimony that the only known trigger for RLF is hyperoxia, we still fail to see a basis in their testimony for their conclusions that a hyperoxic incident or hyperoxic incidents attributable to defendant caused Joshua's blindness. Plaintiffs' experts asserted a reasonable degree of medical certainty that defendant's ventilator equipment probably caused Joshua's injury, but their opinions were not grounded in facts that justify a reasonable degree of medical certainty.

Plaintiffs' experts conceded that medical science has not established how much oxygen triggers RLF or how long or frequent one's exposure to excessive oxygen must be for constriction and destruction of one's retinal blood vessels to occur. Further, plaintiffs' experts only established that excessive oxygen triggers the disease. They did not testify that it plays any subsequent role in exacerbating injury, and apparently no medical authority has suggested that it does. Thus, if defendant caused one or even many hyperoxic incidents only after the disease process had already begun, it would not have caused Joshua's injury, regardless of how defective its product might be.

■ To assign responsibility for Joshua's injury to defendant is arbitrary, as consideration of his medical records makes clear. Those records indicate both that Joshua had numerous exposures to high concentrations of oxygen and that he had many hyperoxic incidents as measured by his PaO-2 levels. Joshua was exposed to 100% oxygen during his trip from Cone Hospital in Greensboro to North Carolina Memorial Hospital in Chapel Hill and presumably on numerous other occasions during hand bagging. Further, plaintiffs' experts conceded that no known PaO-2 level existed that might not trigger RLF. According to their testimony, Joshua ran a risk of RLF blindness even had his PaO-2 level always remained in the target level. Plaintiffs' experts theorized quite plausibly that the risk of injury increases as do PaO-2 levels. Even so, Joshua had fifty recorded occurrences of PaO-2 levels above the target level and twenty-two occurrences of PaO-2 readings of 100 or higher. Plaintiffs have only associated three of these elevated PaO-2 readings with the Bourns equipment. Moreover, because the nursery staff did not monitor Joshua's PaO-2 level continuously, it is likely that many other elevated levels went unrecorded. Given Dr. Kraybill's and Dr. Rogell's testimony regarding the etiology of the disease, they could not, consistent with that testimony, single out with reasonable medical certainty two or three hyperoxic incidents as more probably than not the cause of Joshua's injury.[9] There is simply no way to tell whether Joshua's first, fifth, or last hyperoxic incident caused his injury, or whether some combination of exposures is to blame. Given the number of such incidents, we do not believe that there was sufficient evi-

---

9. Plaintiffs would have presented a very different case had they linked all or most of the elevated PaO-2 readings to defendant's equipment. Even then considerable uncertainty about causation would remain given the limits of medical knowledge and Joshua's exposure to high concentrations of oxygen from other sources. We do not think that the doctrine of res ipsa loquitur fills this evidentiary gap left by plaintiffs. Res ipsa loquitur is inapplicable here because during Joshua's use of the Bourns

dence of causation to raise an issue for the jury.[10]

## IV.

In almost all instances, our tort law presumes that only those people who are at fault shall be held liable for harms to others. Whether under a theory of negligence or under strict liability, one element of the claim is breach of a duty owed to the plaintiff. A second is a causal connection between defendant's conduct and plaintiff's injury. An insistence on causation means that injuries, some of tragic dimensions, go uncompensated by our tort system.[11]

Plaintiffs argued to the jury that defendant breached a duty owed to Joshua and caused his injury, and the jury agreed. There is no question that defendant owed Joshua a duty of due care. Although plaintiffs and defendant disagree as to whether defendant breached that duty, i.e., whether the ventilator equipment was defective, defendant does not contend on appeal that there was insufficient evidence of a defect to raise a jury question.[12] It does, however, contend that there was insufficient evidence of causation adduced at trial. Because we agree, we think the district court erred in denying defendant's motions for a directed verdict and for a judgment not-

withstanding the verdict. We therefore reverse and direct the entry of judgment for defendant.

REVERSED.

---

equipment the hospital staff and not defendant had control over it.

**10.** We recognize the potential for underdeterrence of negligent behavior in cases such as this one. Where uncertainty about causation, whether because of the limits of medical or scientific knowledge or because of a multiplicity of potential causes, allows a manufacturer to evade liability by saying "you cannot be reasonably certain that I caused the injury," that manufacturer's incentive to reduce the riskiness of his products will shrink. Such manufacturers may impose unreasonable risks on others with tragic consequences without having to pay the costs of the harm they do. Some courts have dealt imaginatively with the problems of multiple and indeterminate causation. *See, e.g., Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132, *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980) (market-share liability in DES case); *see generally* Robinson, Multiple Causation in Tort Law: Reflections on the *DES* cases, 68 Va.L.Rev. 713 (1982). Liability in the instant case could only be grounded on a further extension of *Sindell* to

include multiple causes that are, perhaps, incommensurable. North Carolina tort law does not permit us to stretch the rules of tort liability so far. Courts are limited in the means available to them to deal with this problem of underdeterrence.

**11.** Ours is not the only imaginable system of tort law. Its critics offer widely divergent alternatives emphasizing divergent goals. *E.g.,* Abel, A Critique of American Tort Law, 8 Brit.J.L. & Soc'y 199 (1981); Franklin, Replacing the Negligence Lottery: Compensation & Selective Reimbursement, 53 Va.L.Rev. 774 (1967). We do not enter this debate, though we recognize its importance. We may not ignore current legal standards, however, in the name of such criticism and with the excuse that plaintiffs' is a sympathetic case.

**12.** Defendant does, however, appeal from some of the district court's evidentiary rulings relating to evidence of negligence, most notably its admission of evidence of subsequent remedial measures.