844 F.2d 156
 Sarah B. CRINKLEY; James E. Crinkley, Plaintiffs-Appellees,
v.
HOLIDAY INNS, INC.; Traveler's Management Corporation,
a/k/a Travco; American Health Home, Inc.; Frank
Schilagi; C. Roger Harris, Defendants-Appellants,
and
Tola J. Litaker, individually; Dennis L. Hall,
individually; John A. Howard, Jr., individually
and as partners in Summit Associates, Defendants.
 No. 87-1547.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 6, 1987.
Decided April 7, 1988.
 
 Stephen McDaniel Russell, Winston-Salem, N.C., Lloyd C. Caudle, Charlotte, N.C., William Kearns Davis, Winston-Salem, N.C., for defendants-appellants.
 Kennon C. Walden, Jr. (Walden & Walden, P.C., Blackstone, Va., on brief), Walter E. Clark, Jr., Greensboro, N.C., for plaintiffs-appellees.
 Before HALL, PHILLIPS and WILKINSON, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 This is a civil action in which various defendants associated with the Holiday Inns enterprise appeal from jury verdicts finding them liable for personal injuries inflicted by third persons upon the plaintiffs Crinkley, while the Crinkleys were guests in a Holiday Inn Motel. The defendants raise several issues on appeal, principally that the district court erred in denying their motion for judgment notwithstanding the verdict and in refusing to set aside the jury's verdicts as excessive and the product of improper considerations. We find no reversible error and affirm.
 
 
 2
 * Sometime before the weekend of February 27, 28, 1981, the Crinkleys decided to attend a function being held during that weekend at the Charlotte, North Carolina Civic Center. They tried to reserve a room at the Holiday Inn-Charlotte, close to the center, but found that it was fully booked. Looking for alternate lodging, they consulted a Holiday Inn directory that they had obtained during a previous stay at a Holiday Inn. From it they selected the Holiday Inn-Concord and reserved a room for the nights of February 27 and 28. The Holiday Inn-Concord is located some twenty-odd miles north of Charlotte, just off Highway 29, which runs directly south into downtown Charlotte, and Interstate 85, which runs to and around the northern edge of Charlotte.
 
 
 3
 During the approximately two weeks preceding the weekend of February 27, guests at several Charlotte area motels had been assaulted and robbed on the premises by a group later dubbed the "Motel Bandits" in media reports. The motels involved were located throughout the metropolitan Charlotte area, and many of them were located close to Interstate 85. The assistant manager of the Holiday Inn-Concord, Brian McRorie, was aware of the Motel Bandits from the various news media. He was contacted by several unidentified members of the local County Sheriff's Office who wanted to know if McRorie was aware of the Motel Bandits and what plans he had for security at the motel while the Motel Bandits were at large. Some of these officers also offered to serve for a fee as security guards during their off duty hours, a security measure that the motel had used in the past, but did not avail itself of in this instance.
 
 
 4
 As a result of this information, McRorie contacted Jim Van Over about the possibility of hiring security guards to patrol the motel. Van Over was the manager of the Holiday Inn on Woodlawn Road in Charlotte, and had some supervisory responsibility over the Holiday Inn-Concord as an employee of defendant Travelers Management Corporation (TRAVCO), the entity in operational control of the Holiday Inn-Concord. Van Over was also the president of the Metrolina Innkeepers Association and had been interviewed for a newspaper story covering the Motel Bandits. In that article, he noted that his hotel had added security personnel for night patrols. As to McRorie's requests for additional security at the Concord property, however, Van Over concluded that extra security measures were not justified. McRorie did instruct his employees to be particularly alert for anything suspicious and he periodically patrolled the premises on February 27, the last time being sometime between 8:00 and 8:30 p.m. The motel also continued its program to encourage local law enforcement personnel to frequent the premises by offering a free snack tray and discount meals in the restaurant though it did not employ any as security guards.
 
 
 5
 At approximately 8:00 p.m. on February 27, the Crinkleys arrived at the Holiday Inn-Concord. After spending a short time checking in, they parked their car in front of their room and began unloading their baggage. As James Crinkley was bringing in the last of their items, Sarah Crinkley, who was standing in the doorway to their room, noticed a man come around the corner of the motel and begin walking toward them. When the man reached the Crinkleys' room, he stopped and asked to speak with James Crinkley. Almost immediately, the man began trying to push the Crinkleys into their room. Despite James Crinkley's efforts to resist him, the man succeeded in getting the Crinkleys into their room. The man was armed with a gun, and once inside he beat James Crinkley, turned on the television and called for his accomplices. He was joined in the room by two men who again beat James Crinkley, bound and gagged him, and put a mattress on top of him. After going through the Crinkleys' possessions, the men approached Sarah Crinkley. They pushed her down and asked for her money and her engagement ring. When she told them that the ring would not come off, one of the men put a gun to her head and told her that if she did not take it off, he would "blow her brains out." She got the ring off and gave it to the men. They then bound and gagged her before fleeing. She was able to free herself after a short time. She removed the mattress and gag from her husband and called the front desk for help. The desk clerk notified the Cabarras County Sheriff's Office and a deputy arrived at the Crinkleys' room within minutes.
 
 
 6
 The Crinkleys were taken to an area hospital for emergency medical care. James Crinkley sustained multiple bruises to his head and upper body region, as well as a severely broken jaw. His broken jaw was wired, a condition which lasted approximately six weeks. Sarah Crinkley's subsequent condition was more complicated. Before the assault she was under a doctor's care for hypertension and obesity. In April of 1982--approximately fourteen months after the assault--she suffered a heart attack. A balloon angioplasty was performed in an effort to clear the blockage in her arteries, but was not successful. After consulting with her doctors, she opted for heart by-pass surgery to treat her condition. In addition to her cardiac problems, friends and family noted that Sarah Crinkley's personality changed drastically after the assault. She became fearful, anxious and withdrawn. Her activities also were observed to be much more restricted. In early 1984, she began seeing a psychiatrist who diagnosed her as suffering from post-traumatic stress disorder and major affective disorder.
 
 
 7
 The Crinkleys brought suit against several defendants variously associated with the Holiday Inn-Concord alleging, inter alia, that the defendants were negligent by providing them inadequate security and that such negligence was the proximate cause of their injuries. After pre-trial rulings, Holiday Inns, Inc., TRAVCO, American Health Home, Inc., Frank Schilage, and Roger Harris remained as defendants. The last three were alleged to be liable as the actual owners of the motel. TRAVCO was alleged to be liable as the entity in actual day-to-day control of the operation of the motel, which was managed under a franchise agreement with Holiday Inns. Holiday Inns was alleged to be liable on the theory of actual authority or, alternatively, apparent agency. The basis of both agency theories was a franchise agreement, which gave Holiday Inns the right to control certain aspects of the motel's operation.
 
 
 8
 At trial, the Crinkleys relied primarily on the testimony of Brian McRorie to show that the assault was reasonably foreseeable. They introduced testimony from a security expert that the measures in effect at the Holiday Inn-Concord were inadequate to deal with the potential threat. The main deficiencies identified were inadequate fencing around the perimeter of the property, and the lack of no trespassing signs and of any security patrols. Medical experts opined that both Sarah Crinkley's heart attack and her psychological problems were due to the stress she continued to experience in the wake of the assault.
 
 
 9
 Following the denial of motions for directed verdict, the jury returned verdicts in favor of the Crinkleys against all the defendants above identified, finding in special verdicts that the criminal acts were reasonably foreseeable by the motel owners and TRAVCO, that those defendants were negligent in providing inadequate security, and that such negligence caused the Crinkleys' injuries. Holiday Inns was found vicariously liable on the basis of apparent agency. The jury awarded Sarah Crinkley $400,000 and James Crinkley $100,000 in compensatory damages.
 
 
 10
 Following the verdict, defendants moved for judgment notwithstanding the verdict or, conditionally, for a new trial. The motions were denied and this appeal followed.
 
 II
 
 11
 We first consider defendants' contention that the district court erred in denying their motion for judgment n.o.v.
 
 
 12
 In a diversity case, the standard for assessing the sufficiency of the evidence to establish a submissible case under state substantive law is governed by federal law, Owens ex rel. Owens v. Bourns, Inc., 766 F.2d 145, 149 (4th Cir.1985) (citation omitted).
 
 
 13
 Under the federal standard, applied alike at trial and on review, the evidence and all reasonable inferences from it are assessed in the light most favorable to the non-moving party, Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 243 n. 14 (4th Cir.1982), and the credibility of all evidence favoring the non-moving party is assumed. Tights, Inc. v. Acme-McCrary Corp., 541 F.2d 1047, 1055 (4th Cir.1976). Assessed in this way, the evidence must then be "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment could reasonably return a verdict for the non-moving party...." Wyatt v. Interstate & Ocean Transp. Co., 623 F.2d 888, 891 (4th Cir.1980). A "mere scintilla of evidence" is not sufficient to withstand the challenge, Gairola v. Virginia Dept. of Gen. Services, 753 F.2d 1281, 1285 (4th Cir.1985) (citation omitted).
 
 
 14
 In North Carolina, as generally, the elements of the prima facie negligence claim are the familiar ones: (1) a duty by defendant to conform his conduct to a particular standard of care, (2) breach of that duty, (3) proximate causation, and (4) injury. Plyler v. Moss & Moore, Inc., 40 N.C.App. 720, 254 S.E.2d 534, 537 (1979) (citation omitted).
 
 
 15
 Applying the federal standard of sufficiency of evidence, we believe the evidence was sufficient to withstand the motion for judgment n.o.v. on all these elements.
 
 
 16
 The duty here in issue is that of a landowner or lessee to business invitees on his premises. In North Carolina, as generally, there is no duty on such a person's part to insure the safety of his invitees. Foster v. Winston-Salem Joint Venture, 303 N.C. 636, 281 S.E.2d 36, 38 (1981). Rather, such a person owes only the general duty of exercising reasonable or ordinary care for their safety. Murrow v. Daniels, 85 N.C.App. 401, 355 S.E.2d 204, 207 (1987), rev. granted, 320 N.C. 514, 358 S.E.2d 522 (1987); Foster, 281 S.E.2d at 38. While this duty does not ordinarly extend to protecting invitees from the intentional, criminal acts of third persons, Brown v. North Carolina Wesleyan College, Inc., 65 N.C.App. 579, 309 S.E.2d 701, 702 (1983), it may in appropriate circumstances. Foster, 281 S.E.2d at 38-39. Specifically, such a duty of care may in appropriate circumstances be found owed by the operators of places of public accommodation to their guests. See Murrow (motel owner); Urbano v. Days Inn of America, Inc., 50 N.C.App. 795, 295 S.E.2d 240 (1982) (same). See also Brown (duty owed by college); Sawyer v. Carter, 71 N.C.App. 556, 322 S.E.2d 813 (1984) (duty owed by convenience store owner).
 
 
 17
 Foreseeability determines "whether a duty to protect [his] business invitees against criminal acts of third persons will be imposed upon a particular landowner in a particular case." Sawyer, 322 S.E.2d at 814. Foreseeability may be shown by all relevant evidence, including that of prior criminal activity on the premises involved, or in the general area in which the premises is situated. Sawyer. Defendants contend that the evidence of prior criminal activity here was insufficient in and of itself to make it reasonably foreseeable that "Motel Bandits" operating in Charlotte would threaten the Holiday Inn-Concord thereby giving rise to a duty to protect against that particular risk. We disagree.
 
 
 18
 While the evidence of prior criminal activity at the Holiday Inn-Concord might alone be insufficient to establish the foreseeability of criminal activity on the premises, compare Brown (evidence of sporadic incidents of crime over several years found insufficient to impose a duty on the defendant-landowner to make its premises safe), we think that the evidence in its totality sufficed here to permit a jury finding of duty to take reasonable precautions.
 
 
 19
 In the two weeks just before the attack on the Crinkleys, seven motels within the general area had been victimized by what the police and press had identified as the same group of assailants. At times, the group struck at more than one motel in a single night. The systematic nature of the attacks, their apparent perpetration by a single group, and the fact that the group continued to operate even after law enforcement efforts had focused on them and Charlotte motels were alerted to their presence make it reasonably foreseeable that the attacks would continue.
 
 
 20
 The prior incidents were not confined to any particular, narrow section within Charlotte. Many of the reported sites there were separated by several miles. Interstate 85 and Highway 29 provide both convenient access to Concord from Charlotte and a ready escape route out of Concord. Commuting between the two cities was regular and substantial. The Crinkleys themselves decided to stay in Concord though their ultimate destination was Charlotte, and even the new general manager of the motel at the time commuted to work there from his home in Charlotte.
 
 
 21
 Finally, the evidence is sufficient to establish that it was reasonably foreseeable that the Holiday Inn-Concord might be a target. The premises was a motel near a major highway, making it similar to several of the motels victimized in Charlotte. Evidence at trial indicated that motels with relatively more affluent clienteles, judged by reference to room rates, were the preferred targets. The Holiday Inn-Concord was in this category. That relatively lax security measures necessarily enhance the attractiveness of a particular motel as a potential target is manifest. Urbano, 295 S.E.2d at 242 ("[D]efendant ... should have reasonably foreseen that the conditions on its motel premises were such that its guests might be exposed to injury by the criminal acts of third persons....").
 
 
 22
 In addition to the circumstantial evidence of foreseeability, there was evidence of actual notice of the specific threat. McRorie, the motel's assistant manager, testified that he was aware of the "Motel Bandits" depradations. He also testified that he was contacted by local law enforcement officers who wanted to make sure that he was aware of the situation and would make adequate security arrangements. Some of these officers offered their services as security guards for hire, on the specific basis of this particular threat. McRorie himself took the threat seriously enough to ask his superiors about the possibility of hiring patrol guards. And though he was told that the threat did not justify taking such action, he warned his employees to be alert to suspicious circumstances and patroled the premises the night the Crinkleys were attacked.
 
 
 23
 We believe that this evidence sufficed to create a jury question on the issue of foreseeability and that a jury could reasonably conclude that because an attack on its guests was reasonably foreseeable, a duty of taking specific protective measures was imposed by the circumstances upon the defendants.
 
 
 24
 To prove that the special duty of care created by the circumstances was breached, the Crinkleys relied primarily on the testimony of an expert in hotel-motel security, Kenneth Prestia.
 
 
 25
 Prestia testified that security at the Holiday Inn-Concord was inadequate in several respects. The motel had widespread access from several directions, a security problem exacerbated by the fact that the front desk did not provide employees with a view of all points of access. Existing fencing was of inadequate height adequately to deter access to the premises and there were no "no trespassing" signs around the perimeter. He opined that these obvious physical measures have a deterrent effect on crime by conveying the impression that the motel maintained a heightened security posture, and that their absence therefore increased the risk of criminal activity on the premises.
 
 
 26
 Prestia also opined that there were inadequacies apart from these physical measures. The motel had not instituted a formal security plan specifically tailored to the premises and did not employ security patrols. Prestia testified that security patrols are again particularly important where there is widespread access to the motel and limited observation from the employees. On this same point, he noted that more security patrols could be added during a period of higher crime activity or an increased threat of crime, a measure that could be taken by hiring off-duty law enforcement personnel.
 
 
 27
 The defendants did not introduce any expert evidence of their own to counter Prestia's assessment of lax security at the motel. Through cross-examination, they attempted to impeach Prestia's contention that security at the motel was lax and that many of the measures he suggested would have the effect of increasing security. The defendants also attempted to portray the Holiday Inn-Concord as a quiet, safe motel that did not require the extreme security measures urged by Prestia.
 
 
 28
 Considering Prestia's testimony and the fact that Holiday Inn's own Loss Prevention Manual suggests some of the same security measures whose absence he emphasized, we think there was enough evidence for the jury reasonably to conclude that the defendants breached their duty to provide adequate security to protect their guests against the specific, known foreseeable risk created by the circumstances.
 
 
 29
 The defendants contend that, even if they breached any special duty of care owed their guests by reason of the circumstances their negligence in doing so was not the proximate cause of the assault on the Crinkleys. They make several arguments in support. First, focussing on some of the proposed security improvements--such as "no trespassing" signs and additional fencing that still left open entranceways onto the property--they argue that there is no reasonable probability that these measures would have deterred the specific assault. They point out that the Crinkleys proved no specific facts about the method of the assault that show that any of the proposed security measures might have made a difference. Finally they argue that the specific facts of this case--particularly Sarah Crinkley's admission that the first assailant did not appear suspicious and the fact that McRorie looked about the premises throughout the day of the assault, including sometime between 8:00 and 8:30 p.m.--belie the claim that added security measures, specifically patrol guards, might have detected the assailants and prevented the assault.
 
 
 30
 Defendants' argument would be persuasive if the stringent rule of proximate causation in cases of this type necessarily implied by their arguments were the rule in North Carolina. Under the rule they suggest, proximate causation between a landowner's failure to provide particular protective measures and an invitee's injury could only be established by proof that the particular measures would have prevented the particular injury. Such a rule has indeed been espoused by some able judges concerned that the alternative is effectively to convert landowners into insurers of their guests' safety from all criminal assaults. See Orlando Executive Park, Inc. v. P.D.R., 402 So.2d 442, 451-52 (Fla. 5th Distr.Ct.App.1981) (Cowart, J., dissenting); Reichenbach v. Days Inn of America, Inc., 401 So.2d 1366, 1367-71 (Fla. 5th Distr.Ct.App.1981) (Cowart, J., concurring specially) (same). Whatever there may be to commend such a rule as a matter of policy, we do not understand that it is now the rule in North Carolina. There, we believe, the rule is a much less stringent one which would permit a jury to infer proximate causation from a much less ironclad link between specific security deficiencies and a specific criminal assault upon a guest. As the parties apparently agree, the question of proximate causation seems not to have been addressed as a separate element in any of the relevant North Carolina decisions recognizing and applying this general theory of recovery against landowners. Rather, the causation question seems generally to be subsumed in the courts' analyses within the general issue of foreseeability.[1] Certainly the most relevant decisions assume a right to recover on evidence that would not support recovery under the stringent proximate causation requirement urged by appellants. See Murrow, 355 S.E.2d at 207-08; Sawyer, 322 S.E.2d at 814 ("foreseeability ... the standard for liability"); Urbano, 295 S.E.2d at 241-42.
 
 
 31
 Under the less stringent test which we understand the North Carolina cases to apply, there was sufficient evidence to support the jury finding of proximate causation. The jury was entitled to accept the expert Prestia's opinions that criminals typically assess the risk of apprehension presented by the security measures in place, frequently by on-site surveillance of practices; and that the measures taken on the premises here in issue would not have acted as an effective deterrent. Having accepted this conclusion, the jury could reasonably have inferred--though surely it need not have--that the Crinkleys' assailants were indeed emboldened by the lax security measures to come on the premises, size up the situation, and plan their assault. The fact that it took some time to get the Crinkleys into their room supports the inference that the assailants were aware that security patrols were not in place.
 
 
 32
 While we think the issue a close one, we cannot disagree with the district court's assessment that the question of proximate causation was one for the jury.
 
 III
 
 33
 Defendants challenge the damage awards in two ways. First, they contend that there was insufficient evidence to prove the necessary causal link between the assault and Sarah Crinkley's heart attack and psychological problems and her related medical expenses, so that these should not have been submitted to the jury as potentially compensable items of damage. Second, they contend that the damage awards were so excessive that they should have been set aside. We take these in order.
 
 
 34
 * "The doctrine of proximate cause which determines the existence of liability for negligence is equally applicable to liability for particular items of damage." Gillikin v. Burbage, 263 N.C. 317, 139 S.E.2d 753, 759 (1965). To impose liability, "the defendant's negligence must have been a substantial factor, that is, the proximate cause of the particular injuries for which plaintiff seeks recovery." Id. (citations omitted) (emphasis in original). This principle is expressed in the "thin skull plaintiff" rule under which, if the defendant's "misconduct amounted to a breach of duty to a person of ordinary susceptibility, he is liable for all damages suffered by plaintiff notwithstanding the fact that these damages were unusually extensive because of peculiar susceptibility," Lockwood v. McCaskill, 262 N.C. 663, 138 S.E.2d 541, 546 (1964) (citations omitted). Stated differently, a defendant is "liable only to the extent that his wrongful act proximately and naturally aggravated or activated plaintiff's condition." Potts v. Howser, 274 N.C. 49, 161 S.E.2d 737, 742 (1968).
 
 
 35
 We are satisfied that there was sufficient evidence of a causal link between the assault and Sarah Crinkley's heart attack and psychological condition to permit the jury to award damages related to those conditions.[2]
 
 
 36
 Dr. Silverman, Sarah Crinkley's psychiatrist, testified that based on patient history and examination, it was his reasoned medical opinion that Sarah Crinkley suffered from post-traumatic stress disorder--chronic type--and major affective disorder with melancholia. He described the factors necessary to make a diagnosis of each disease and testified that Sarah Crinkley fully met the diagnostic criteria for post-traumatic stress disorder, and that the narrative evidence supported his explanation of both diagnoses. Dr. Silverman also testified that it was his reasoned medical opinion that her complaints--which served as a partial basis for diagnosis--were genuine and that the motel assault caused her diagnosed mental illness.
 
 
 37
 Dr. Bennett, a cardiologist who treated Sarah Crinkley following her heart attack, testified that he had noted a marked fear and anxiety in Sarah Crinkley 48-72 hours following her heart attack--a time when patients usually exhibit a relaxing of tension, and even euphoria, based on the realization they have survived a life threatening event. On inquiry, he discovered the assault and its effect on the patient. He explained that stress causes the release of certain hormones which medical research has linked to the acceleration of atherosclerosis--hardening of the arteries--which was the direct cause of the patient's heart attack. He compared Sarah Crinkley's situation to that of policemen or firemen, groups that medical learning indicates have an increased risk of atherosclerosis due to the constant stress they function under. He concluded that based on his education, training and evaluations of Sarah Crinkley, it was his reasoned medical opinion that the motel assault caused Sarah Crinkley's heart attack.
 
 
 38
 Dr. Harris, her family doctor, testified to his observation of the patient's stressful and fearful state following the assault. In response to variously phrased questions he testified in succession that it was his reasoned medical opinion that: (1) the assault contributed to the heart attack; (2) the assault was a cause of the heart attack; and (3) the assault was the prime cause of the heart attack. His conclusion was based on the stress caused by the incident, which in turn led to the heart attack.
 
 
 39
 Finally, numerous witnesses testified that Sarah Crinkley showed marked personality and emotional changes following the assault. Observations included notable anxiety, fearfulness, withdrawal, sadness, lack of activity, and an inability to work. This evidence is corroborative of the medical testimony that Sarah Crinkley was suffering from a significant amount of stress caused as a result of the assault.
 
 
 40
 The Crinkleys presented expert testimony that it was medically and scientifically plausible that significant stress could produce or accelerate atherosclerosis to the point of heart attack. Further, they removed the cause of Sarah Crinkley's own heart attack from the realm of conjecture by providing competent medical testimony from which the jury would conclude that the stress from the assault was the prime causal factor. They also produced expert testimony, corroborated by significant lay testimony, that the assault produced severe stress in Sarah Crinkley.
 
 
 41
 We are also satisfied that the evidence was sufficient to connect the disputed medical expenses to the assault. As noted above, there was evidence that linked the assault to Sarah Crinkley's heart attack. The evidence also showed that the heart attack itself resulted from the occlusion of an artery in her heart and that the resulting added stress on her remaining "good" arteries necessitated invasive treatment. A balloon angioplasty was attempted as a means of opening the closed artery; however, the procedure was unsuccessful. The record indicates that after this unsuccessful treatment, by-pass surgery was recommended and ultimately performed. From this evidence alone, the jury could infer that all of Sarah Crinkley's heart-related medical procedures for which expenses were claimed were linked to the assault. The district court therefore properly submitted this damages issue to the jury.
 
 B
 
 42
 We next consider defendants' contention that the district court erred in not setting aside the damages awards as excessive.
 
 
 43
 The grant or denial of a motion for a new trial on the ground that the verdict is excessive is a matter committed to the sound discretion of the trial court. 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2818 at 118 (1973 and Supp.1987). In reviewing the trial court's ruling for abuse of discretion, we are bound by an extremely stringent standard. We may not reverse a denial of the motion unless the verdict is so " 'untoward, inordinate, unreasonable or outrageous' " as to demand being set aside. Grunenthal v. Long Island R.R., 393 U.S. 156, 160, 89 S.Ct. 331, 334, 21 L.Ed.2d 309 (1968). And "[i]f the question of excessiveness is close or in balance, we must affirm." Dagnello v. Long Island R.R., 289 F.2d 797, 806 (2d Cir.1961). Ultimately, the verdict must stand if there is in the record credible evidence which if accepted by the jury and given its most favorable inferences will support it. Guided by this stringent standard, we believe that the awards in this case are not "so high that it would be a denial of justice to permit ... [them] to stand." Id.
 
 
 44
 Looking first to Sarah Crinkley, the jury awarded her $400,000 in compensatory damages. The evidence at trial was sufficient for the jury to conclude that she has been deeply affected by the incident, both physically and emotionally, and that she has not yet recovered. Several witnesses testified that this once active, lively, and outgoing woman has become withdrawn, melancholy and suffers from constant fearfulness. Her psychiatrist testified that she suffers from severe mental disorders as a result of the assault and will not likely ever return to her former self. There was evidence from which the jury could conclude that the assault aggravated Sarah Crinkley's heart problems, eventually causing her to suffer a heart attack, and that the heart attack necessitated a series of medical procedures culminating in heart by-pass surgery. Sarah Crinkley's medical costs alone amounted to over $40,000. The assault itself was highly traumatic. During the ordeal she was threatened with death, a gun was placed to her head, and she was bound and gagged. She twice witnessed the beating of her husband, and at one point was led to believe that he was dead.
 
 
 45
 As to James Crinkley, the jury awarded him $100,000 compensatory damages. The evidence at trial showed that he was beaten severely and had his jaw broken in two places. His jaw was wired closed for six weeks. Though he has fully recovered from the incident, his life has been dramatically altered as a result of the assault and its aftermath.
 
 
 46
 These awards are not outrageous in light of the evidence which the jury was entitled to accept. We thus decline to set them aside.
 
 IV
 
 47
 Finally, Holiday Inns contends that the district court erred in submitting the claim against it to the jury on a theory of apparent agency. They argue first that because, as the district court properly held, the evidence would not support a finding of actual agency, they could not therefore be found liable on the basis of apparent authority. They then contend that in any event the evidence was insufficient to support a finding of apparent agency.
 
 
 48
 On the first point, Holiday Inns is simply confused. It is true that apparent authority presupposes actual agency, and only operates to extend the scope of an actual agent's authority. See generally Restatement (Second) of Agency Sec. 8 (1958); see, e.g., S.F. McCotter & Son, Inc. v. O.H.A. Indus., Inc., 54 N.C.App. 151, 282 S.E.2d 584, 586 (1981).
 
 
 49
 But there is the related principle of apparent agency or agency by estoppel under which agency itself may be imposed by law on legal relations. Though no actual agency exists, a party may be held to be the agent of another on the basis that he has been held out by the other to be so in a way that reasonably induces reliance on the appearances. See, e.g., Fike v. Board of Trustees, 53 N.C.App. 78, 279 S.E.2d 910, 912 (1981) (citation omitted) (recognizing that a party may be liable for the acts of another under the theory of agency by estoppel even where no agency relationship in fact exists); see generally Restatement (Second) of Agency Sec. 267. It is clear here that the theory submitted to the jury by the district court was agency by estoppel; the issue submitted was whether TRAVCO had the power to bind Holiday Inns by virtue of its appearance as Holiday Inns' agent. Holiday Inns in fact accepts this in its brief by arguing that there was insufficient evidence to establish apparent agency, and we will review the record on that basis.
 
 
 50
 In establishing liability based on apparent agency, a plaintiff must show that (1) the alleged principal has represented or permitted it to be represented that the party dealing directly with the plaintiff is its agent, and (2) the plaintiff, in reliance on such representations, has dealt with the supposed agent. Fike, supra; see also Restatement (Second) of Agency Sec. 267 (1958) (justifiable reliance and change of position). We believe the evidence sufficed to support submission of this theory.
 
 
 51
 By virtue of the franchise agreement, Holiday Inns retained a significant degree of control over the operation of the Holiday Inn-Concord. This control included the use of the Holiday Inns trade name and trademarks, which appeared on numerous items in and about the motel. The motel itself was originally designed and built by Holiday Inns and sold in 1976 to a group that later conveyed it to the current owners. The company engages in national advertising that promotes its national system, without distinguishing between company owned and franchised properties. It also apparently publishes a directory listing the properties within its system, also without distinguishing between company owned and franchised properties. The only indication that the Holiday Inn-Concord was not owned by Holiday Inns was a sign in the restaurant that stated that the motel was operated by TRAVCO under a franchise agreement. Holiday Inns contends that the franchise agreement disclaims any agency relationship. However, the denial of an agency relationship in a franchise agreement is not alone determinative of liability. See Drummond v. Hilton Hotel Corp., 501 F.Supp. 29, 31 (E.D.Pa.1980). As indicated, agency by estoppel specifically applies to situations where no actual agency relationship exists. We think that a jury could reasonably conclude that the Holiday Inn-Concord was operated in such a way as to create the appearance that it was owned by Holiday Inns, Inc. and that this was one of the purposes of the franchise agreement.
 
 
 52
 As to the reliance prong of the test, Sarah Crinkley testified that she and her husband had previously stayed at Holiday Inns and that she was familiar with its national advertising. She also testified that they originally attempted to make reservations at a Holiday Inn in Charlotte because they thought it would be a good place to stay. Rather than looking for another Charlotte area hotel when they could not get a room at the Holiday Inn near their destination, they used a Holiday Inn directory to find another convenient motel. James Crinkley testified that he did not know the difference between a franchise inn and a company owned inn at the time of February 27, 1981, and noted that he would be greatly surprised to find out that Holiday Inns was not involved in the operation of the Holiday Inn-Concord beyond the franchise agreement. While the Crinkleys' evidence of actual reliance may be marginal, we think it sufficed under the applicable substantive principles to raise a jury issue.[3]
 
 
 53
 AFFIRMED.
 
 
 54
 WILKINSON, Circuit Judge, concurring in part and dissenting in part:
 
 
 55
 Like the majority, I am saddened by the sequence of events that has befallen Sarah Crinkley. The assault suffered by the Crinkleys was absolutely dreadful. No one disputes that the circumstances are poignant, yet there remains the need to remember that wrenching facts may wrest a body of law from its moorings and foundations. That is what has happened to North Carolina tort law in this case.
 
 
 56
 The law of tort performs important functions: it has compensated the victims of wrongful acts and enhanced, through deterrence, our basic sense of safety. It cannot, however, provide an answer to every personal misfortune, and it is not intended to replace the role of non-liability insurance, private pensions, public assistance, and the like in promoting the well being of our citizens.
 
 
 57
 The chain of liability and recovery which obligates Holiday Inns, et al., to compensate Sarah Crinkley for her injuries is an exceedingly tenuous one consisting of a series of weak links. To appreciate the implications of this case, it is important to put into perspective exactly what transpired here. Plaintiff contends that the motel's failure to post "no trespassing" signs, extend its fences, and to keep a proper look out resulted in the assault on her by the "motel bandits," which, in turn, resulted in a heart attack more than a year later. Then, through a theory of apparent agency, Holiday Inns, Inc. is joined as a defendant in the action despite the fact that the motel was run by an independent franchise and Holiday Inns played no role in its management.
 
 
 58
 The upshot of the majority's decision is, therefore, that an innkeeper not responsible for managing the premises is found, under a marginal theory of causation, to have proximately caused an assault by third party criminal actors which in turn is found to have caused a heart attack occurring at a remote point in time. With all respect, speculation seems piled upon speculation until the label of tortfeasor can be pinned on some deep pocket in the vicinage.
 
 
 59
 With part of the majority's opinion, I can concur. Because innkeepers have a responsibility to provide for the safety of their guests, I would agree that the case on liability, though marginal, presents a jury question under North Carolina law. The law of North Carolina does not, however, hold a negligent party responsible for medical events that occur long after the unfortunate incident. The majority in this case would lay at the feet of Holiday Inns, et al., liability to the plaintiff for the most speculative effects of the trauma that followed her injury by intervening criminal actors. Because such a holding stretches the thin-skull theory of tort liability to cover the most remote of medical mishaps, I respectfully dissent.
 
 
 60
 Plaintiff is now to recover damages, not only for the trauma and injuries that she sustained in the assault, but also for a heart attack she suffered fourteen months later as well as for hospital and medical expenses incurred in treating her heart condition for a period extending up to five and one-half years after the assault. This is highly problematic. The evidence indicates that Sarah Crinkley was sixty-six years old at the time of the assault. She was overweight and had a history of arteriosclerosis, chest pains, and high blood pressure for which she had been under a physician's care since 1978. She was clearly exposed to alternate sources of stress with the closing of the family hardware store where she worked. Although North Carolina recognizes the "thin skull" rule, making tortfeasors liable for the "unusually extensive" damages resulting from their negligence to persons of "peculiar susceptibility," see Lockwood v. McCaskill, 262 N.C. 663, 138 S.E.2d 541, 546 (1964), the North Carolina Supreme Court has clearly articulated the limits of a tortfeasor's liability for injuries suffered by persons with such preexisting susceptibilities.
 
 
 61
 [When] injuries are aggravated or activated by a pre-existing physical or mental condition, defendant is liable only to the extent that his wrongful act proximately and naturally aggravated or activated plaintiff's condition. 'The defendant is not liable for damages ... attributable solely to the original condition.' ... Plaintiff is confined to those damages due to its enhancement or aggravation.
 
 
 62
 Potts v. Howser, 274 N.C. 49, 161 S.E.2d 737, 742 (1968).
 
 
 63
 This process obviously contemplates that juries will play an important factfinding role. I recognize that factfinding can be a murky undertaking. Juries may be required to make complex determinations on causation based on circumstantial evidence. We do not demand of a jury certitude in its conclusions, for the civil standard is one of proof by a preponderance of the evidence. This system does not, however, permit federal judges to abdicate to juries their responsibility to apply the injunctions of state law.
 
 
 64
 The majority forsakes any sense of limits and permits the jury to engage in rampant speculation as to whether and to what extent Sarah Crinkley's heart attack and subsequent medical expenses were "due to" the enhancement of her preexisting condition as the result of the motel's breach of its duty of care. North Carolina law does not permit such speculation. The Supreme Court of North Carolina held in Lee v. Stevens, 251 N.C. 429, 111 S.E.2d 623 (1959), that evidence which "leaves the causal relationship between the accident and the [injury] in the realm of conjecture and speculation ... is insufficient to support a verdict and judgment." Id. 111 S.E.2d at 626-27. The majority ignores the point under North Carolina law where the jury departs from its normal factfinding function and enters the realm of the conjectural.
 
 
 65
 The fact that an expert can be enlisted in support of one proposition or another does not establish automatically the existence of a jury question. At least nothing in recent Supreme Court opinions leads us in that direction. Cf. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although Sarah Crinkley's physicians testified that her heart attack was "caused" by the assault, their testimony on the degree of causation was ambiguous and they admitted that the rate of occlusion of her arteries was unknown. Dr. Bennett admitted that "it would be conjecture on [his] part" to say how long it took the vessels to become totally occluded. Dr. Harris testified that he "just [could]n't say what the occlusion was [at the time of the assault.]" Thus, the question of causation remains problematic, for it is obvious that heart attacks and heart disease are complex physiological processes resulting from the effect, over a great many years, of a combination of hereditary risk factors, personal health habits, life-style, and environmental conditions. Dr. Harris, in fact, testified that "there are a lot of causes that lead to heart attacks."
 
 
 66
 The majority professes faith in the factfinding process, but what we have here finally is not factfinding but sheer guesswork. Of course guesswork can appear in the garb of the adversary process bolstered by expert testimony, but it is guesswork nonetheless. It is wrong to ask the jury to speculate at what no medical expert can say with much assurance, namely the extent to which Sarah Crinkley's heart attack and subsequent medical expenses were attributable to the hotel's negligence or to the other undeniable risk factors and alternate sources of stress in Sarah Crinkley's life.
 
 
 67
 The victims of all torts will suffer some degree of trauma. There must, however, be some limit to the extent that complex and remote medical events in a person's life may be attributed to that trauma. The innkeeper here engaged in what even the majority must recognize was a most marginal form of negligence. While I do not contend that the degree of culpability governs the rule of damages, I do believe a basic injustice has been done here. To require surrogate wrongdoers to compensate victims for the more remote effects of trauma on their preexisting medical conditions will extend tort liability far beyond the bounds defined by North Carolina law. As a result, businesses will become the virtual insurers of the future health of guests and customers injured on their premises and parties of all kinds will be held responsible for medical mishaps long after the occurrence of any negligent act.
 
 
 68
 The majority is crawling on a far limb. Its decision severs tort law from historic notions of fault and causation. Divorced from the concept of responsibility, the law of tort simply loses its deterrent effect. Liability imposed under circumstances such as these will do nothing to deter the negligent conduct, which is only tenuously linked to the injury, by an actor similarly remote from the entity ultimately bearing financial responsibility. Courts have, until recently, interpreted the common law to require that legal obligations bear some relationship to legal wrongdoing. The majority's departure from this framework is replete with implications of policy involving, in the most immediate sense, the obligations of motels and businesses and the cost of goods and services to their guests and customers. The appropriate body to undertake such creative explorations is, first, the North Carolina legislature, secondly, the North Carolina courts, and least of all, a federal court sitting in diversity.
 
 
 69
 I understand and appreciate that the expansion of this field of law owes much to genuine concern for the plight of injured persons. It is no easy thing to draw lines in the face of visible personal misfortune. However, there are claims of justice on both sides of these hard cases which find expression in the limits of state law. With all respect for the sympathetic circumstances presented here, I would reverse and remand for a new trial on damages.
 
 
 
 [1]
 Whether foreseeability more properly relates to duty or to proximate causation is of course one of tort law's most ancient and persistent conceptual problems. Equally persistent are courts' interchangeable uses of the concept for both purposes. See generally Prosser, Law of Torts 236-70 (4th ed. 1971). As a respected commentator on North Carolina law has noted and illustrated, the North Carolina courts make this dual use of the concept. R. Byrd, Proximate Cause in North Carolina Tort Law, 51 N.C.L.Rev. 951, 955 (1973)
 
 
 [2]
 Our dissenting brother would disallow all compensation related to the heart attack. With all respect, it is difficult to understand the legal basis upon which he thinks we properly could do so. While as laymen to medical science we might have intuitive doubts about a causal connection between events so separated in time, our doubts, like his, could only be the doubts of laymen, and those will not suffice to reject this portion of the jury award. Obviously we are in no position to exercise independent medical judgment on the issue, though there seems a bit of that in our brother's discussion. And our function as appellate judges is certainly not to substitute our lay perceptions for those of the authorized lay finders of fact. We ask only whether the favorable evidence bearing on the issue sufficed to allow the jury reasonably to find the connection. On the record we review, all the relevant evidence overwhelmingly supports the finding of causation. Aside from the testimony establishing the bald events and their sequence, that evidence consisted solely of the expert opinion testimony of two medical doctors that causation existed. The qualifications of each to give expert opinion on the issue were not disputed, as indeed they could not have been. Each was a well-qualified treating physician, one a long time family doctor, the other a board cardiologist. Both were natives of the region, with local reputations therefore on the line, rather than roving experts from afar hired only for litigation purposes. Each gave it as his considered medical opinion, with supporting reasons, that the trauma of the motel assault was a proximate cause of the heart attack. J.A. 293 (Bennett); J.A. 387 (Harris) ("prime cause"). One gave the ultimate opinion on causation only after specific admonition by the district judge that the opinion given must involve "probabilities" not "possibilities." J.A. 293. See Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241-42 (4th Cir.1982). Each gave the opinion as being "to a reasonable medical certainty" that there was, not that there might be, the requisite connection. Cf. Ralston Purina Co. v. Edmunds, 241 F.2d 164, 167-68 (4th Cir.1957)
 Such expert opinion is of course the prime--indeed usually the only--way to prove medical causation. Once such an opinion by a qualified expert is admitted, the causation issue is for the trier of fact unless perchance the opinion given is so manifestly incredible as a matter of physical fact within common lay knowledge that it may be legally rejected. Here, none of these legal bases for taking the issue from the jury existed. The opinions given were in proper form to meet the threshold admissibility test. They cannot be said to be manifestly incredible as physical fact within common lay knowledge. Perhaps most significantly, though it would not have prevented submission of the issue, no conflicting expert opinion was proffered by defendants, a circumstance that cannot be explained by tactical choice or unavoidable surprise. See Fed.R.Civ.P. 26(b)(4).
 Under the circumstances, the issue was clearly for the jury. We may not properly exercise raw judicial power to give what we consider a more just result. "Judicial restraint" has more than one aspect.
 
 
 [3]
 The recent North Carolina decision by a divided panel in Hayman v. Ramada Inn, Inc., 86 N.C.App. 274, 357 S.E.2d 394 (1987), rev. granted in part, 320 N.C. 631, 360 S.E.2d 87 (1987), rejecting a comparable apparent agency claim against a motel franchisor, is distinguishable. In that case, the motel guest was required by her employer to stay at the franchised motel. On this basis the court held as a matter of law that necessity rather than reliance on the franchisor's representations dictated the guest's choice. Here, by contrast, the guests were exercising free choice so that their reliance on the franchisor's representations as the controlling factor in this choice was reasonably inferable as a matter of fact. The Hayman majority also thought that the evidence failed as a matter of law to establish that there was any effective misrepresentation of the franchisor-franchisee relationship. Again, in the instant case, the only indication that a franchisor-franchisee relationship existed was a sign in the restaurant which the Crinkleys had had no occasion to see before they checked in