Charles SWALLOWS, Teresia Walker, and Vickie Heidel, Plaintiffs–Appellants,

v.

BARNES & NOBLE BOOK STORES, INC., Defendant,

State of Tennessee, Defendant–Appellee.

No. 96–6088.

United States Court of Appeals, Sixth Circuit.

Submitted July 28, 1997.

Decided Nov. 4, 1997.

Bob Lynch, Jr. (briefed), Nashville, Tennessee, for Plaintiffs–Appellants.

S. Elizabeth Martin (briefed), Office of the Attorney General, Nashville, Tennessee, for Defendant–Appellee.

Before: NORRIS and BATCHELDER, Circuit Judges, ALDRICH, District Judge.*

* The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

## OPINION

ALDRICH, District Judge.

Plaintiffs Charles Swallows, Teresia Walker and Vickie Heidel brought this action, pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111–12117, against Barnes & Noble Book Stores and the State of Tennessee, claiming that they were discharged from their jobs because of their age or disability. The district court granted the State of Tennessee's motion to dismiss and denied plaintiffs' motion for summary judgment.

After settling their claims against Barnes & Noble, plaintiffs filed the instant appeal of the district court's dismissal of their claims against the State of Tennessee.

For the reasons stated below, we affirm.

### I.

The facts of this case are undisputed. Tennessee Technological University ("TTU") is a state university located in Cookeville, Tennessee. Prior to June 15, 1994, Charles Swallows, Teresia Walker and Vickie Heidel were employed by TTU in its bookstore, "The University Store." On or about June 15, 1994, TTU entered into an agreement ("the Agreement") with Barnes & Noble, whereby Barnes & Noble was to act as an independent contractor responsible for the operation and management of the bookstore for a period of at least three years.

Pursuant to the Agreement, Barnes & Noble worked directly with TTU academic departments in order to meet textbook requirements. It was required to sell used books and books requested by the TTU faculty, and was required to give certain discounts to faculty and students. TTU reserved the right to remove any product from the bookstore which it found to be objectionable. The store retained the pre-contract name "The University Store," and Barnes & Noble was not permitted to change the name without written approval from TTU.

TTU owned the building housing the bookstore, as well as the equipment used by Barnes & Noble. Barnes & Noble paid TTU a guarantee or a percentage of sales each year, and was also responsible for utility and telephone costs and all normal operating expenses. TTU employees provided external security, custodial services and snow removal for the building. TTU also provided Barnes & Noble with access to University bulletin boards.

Pursuant to the Agreement, plaintiffs became employees of Barnes & Noble. With respect to former TTU employees, the Agreement provided:

> The Contractor shall employ, on a six (6) month probationary period, all current Bookstore employees ... at no less than such employee's total current salary and benefits (including longevity), or if the Contractor does not employ such Bookstore employees six (6) months, the Contractor shall pay each terminated employee three (3) months salary at the employee's current rate of pay, unless the employee(s) agree [sic] to a transfer with the Contractor's organization, resigns or the termination is due to gross misconduct as per the University's definition of gross misconduct.

> At the end of the probationary period, the Contractor may terminate employees upon ten (10) calendar days written notice for clerical and support, or thirty (30) calendar days written notice for exempt employees.

J.A. at 119. On August 8, 1994, Barnes & Noble discharged plaintiffs and granted them severance pay.

Plaintiffs subsequently filed suit against Barnes & Noble and the State of Tennessee, claiming that their discharge violated the ADEA and the ADA. The State of Tennessee filed a motion to dismiss, arguing that because TTU was not plaintiffs' employer at the time of termination, it could not be held liable under those statutes. On July 10, 1995, plaintiffs filed a motion to amend their complaint to assert that TTU and Barnes &

Noble constituted an "integrated employer" for purposes of the ADEA and ADA, and/or that TTU and Barnes & Noble had a principal-agent relationship, as well as a motion for summary judgment on the issue of whether TTU could be held liable for the acts of Barnes & Noble under either of those theories.

On October 19, 1995, the district court entered an order granting the state's motion to dismiss and denying plaintiffs' motion for summary judgment.[1] Without any analysis or discussion, the court held that "[b]ased on the entire record," TTU and Barnes & Noble could not be considered an "integrated employer," nor could Barnes & Noble be considered an agent of TTU.

Plaintiffs filed this timely appeal.

## II.

We review *de novo* a district court's grant of summary judgment, using the same standard applied by the district court. *Wathen v. General Elec. Co.*, 115 F.3d 400, 403 (6th Cir.1997). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, along with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether there exists a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. at 2510.

## III.

In order to hold TTU liable under the ADEA and/or the ADA, plaintiffs must show that TTU was their "employer" within the meaning of those statutes.[2] It is undisputed

---

1. Because it relied on materials outside the pleadings, the district court treated the State's motion to dismiss as a motion for summary judgment. *See* Fed.R.Civ.P. 12(c).

2. "Because Title VII, the ADEA, and the ADA define 'employer' essentially the same way," we rely on case law developed under all three statutes. *Wathen,* 115 F.3d at 404 n. 6.

that Barnes & Noble, not TTU, was plaintiffs' direct employer. Although a direct employment relationship provides the usual basis for liability under the ADEA or ADA, courts have fashioned various doctrines by which a defendant that does not directly employ a plaintiff may still be considered an "employer" under those statutes. In one approach, courts examine whether two entities are so interrelated that they may be considered a "single employer" or an "integrated enterprise." *See, e.g., York v. Tennessee Crushed Stone Ass'n,* 684 F.2d 360 (6th Cir.1982). In another approach, courts consider whether one defendant has control over another company's employees sufficient to show that the two companies are acting as a "joint employer" of those employees. *See, e.g., Carrier Corp. v. NLRB,* 768 F.2d 778 (6th Cir.1985); *Rivas v. Federacion de Asociaciones Pecuarias de Puerto Rico,* 929 F.2d 814 (1st Cir.1991).[3] A third approach examines whether the person or entity that took the allegedly illegal employment action was acting as the agent of another company,

which may then be held liable as the plaintiffs' employer. *See, e.g., Deal v. State Farm County Mut. Ins. Co. of Texas,* 5 F.3d 117 (5th Cir.1993); *Fike v. Gold Kist, Inc.,* 514 F.Supp. 722 (N.D.Ala.), *aff'd,* 664 F.2d 295 (11th Cir.1981).

Here, plaintiffs seek to hold TTU liable for the actions of Barnes & Noble under two of these theories. First, they argue that TTU and Barnes & Noble should be considered a "single employer."[4] Alternatively, they contend that TTU should be held liable for the conduct of Barnes & Noble under agency principles.

## A. Single Employer

██ Under the "single employer" or "integrated enterprise" doctrine, two companies may be considered so interrelated that they constitute a single employer subject to liability under the ADEA and/or the ADA. *See Armbruster,* 711 F.2d at 1337–38 (Title VII); *York,* 684 F.2d at 362 (ADEA). In determining whether to treat two entities as a single

---

**3.** Both the "single employer" and "joint employer" concepts developed in the labor relations context, *see Radio & Television Broad. Technicians Local 1264 v. Broadcast Serv. of Mobile, Inc.,* 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965) (per curiam)(single employer); *Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964) (joint employer), and were subsequently imported into the civil rights context. *See Armbruster v. Quinn,* 711 F.2d 1332, 1336–37 (6th Cir.1983). Thus, we look to both labor cases and civil rights cases for guidance. *See Rivas,* 929 F.2d at 820 n. 15.

**4.** Although the State also uses the term "joint employer" in its brief to this Court, plaintiffs have never argued that TTU and Barnes & Noble acted as their "joint employer." Admittedly, the opinions of this circuit have not been entirely clear on the distinction between the concepts of "joint" and "single" employer. While we have not squarely addressed the relationship between the two doctrines, we have on occasion used the term "joint employer," without explanation, when applying the "single employer" test. *See EEOC v. Wooster Brush Co. Employees Relief Ass'n,* 727 F.2d 566, 571–73 (6th Cir.1984) (applying single employer test and concluding that two entities could not be considered "a single or joint employer" under Title VII); *Armbruster,* 711 F.2d at 1335–39 (discussing single employer doctrine under heading "Single v. Joint Employer").

As other courts have explained, however, these concepts are analytically distinct. *See Virgo v.*

*Riviera Beach Assoc., Ltd.,* 30 F.3d 1350, 1360 n. 6 (11th Cir.1994); *Rivas,* 929 F.2d at 820 n. 16; *NLRB v. Western Temp. Servs., Inc.,* 821 F.2d 1258, 1266 (7th Cir.1987); *Clinton's Ditch Coop. Co., Inc. v. NLRB,* 778 F.2d 132, 137 (2d Cir. 1985), *cert. denied,* 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986); *NLRB v. Browning–Ferris Ind. of Pennsylvania, Inc.,* 691 F.2d 1117, 1122–23 (3d Cir.1982); *Magnuson v. Peak Technical Servs., Inc.,* 808 F.Supp. 500, 508–510 (E.D.Va. 1992). While the single employer analysis involves examining various factors to determine if two nominally independent entities are so interrelated that they actually constitute a single integrated enterprise, the joint employer analysis has been described as follows:

> The basis of the [joint employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the "joint employer" concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment.

*Browning–Ferris,* 691 F.2d at 1123 (citations omitted). *See also EEOC v. Regency Windsor Management Co.,* 862 F.Supp. 189, 191 (W.D.Mich.1994). Because plaintiffs have never raised the question of whether TTU and Barnes & Noble acted as their "joint employer," we do not address the merits of such a claim here.

employer, courts examine the following four factors: (1) interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control. *York,* 684 F.2d at 362.

None of these factors is conclusive, and all four need not be met in every case. *Armbruster,* 711 F.2d at 1337–38. Nevertheless, control over labor relations is a central concern. *Id.* at 1337; *Murray v. Miner,* 74 F.3d 402, 404 (2d Cir.1996); *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1363 (10th Cir.1993); *Rogers v. Sugar Tree Prod., Inc.,* 7 F.3d 577, 582 (7th Cir.1993); *Trevino v. Celanese Corp.,* 701 F.2d 397, 404 (5th Cir.1983).

■ Examining the four factors in the context of this case, it is clear that TTU and Barnes & Noble cannot be treated as an integrated enterprise. First, there is insufficient evidence of interrelation of operations. TTU and Barnes & Noble each kept their own records, and maintained separate bank accounts and offices. *See York,* 684 F.2d at 362. There is simply no evidence of the type of interrelation found in cases treating two entities as a single employer. *See, e.g., Armbruster,* 711 F.2d at 1338 (finding interrelation of operations where parent company "handled" subsidiary's accounts receivable and its payroll and cash accounting, provided it with administrative backup, monitored its sales shipments, allowed subsidiary's managerial employees to use its company credit cards, and housed subsidiary's bank accounts at its headquarters); *McKenzie v. Davenport–Harris Funeral Home,* 834 F.2d 930, 933–34 (11th Cir.1987) (parent and subsidiary companies were marketed as "twins in service," and parent kept subsidiary's books and records, issued its payroll checks and paid its bills); *EEOC v. Dolphin Cruise Line, Inc.,* 945 F.Supp. 1550, 1553–54 (S.D.Fla.1996) (two companies provided exclusive services to each other, were marketed as twin opera-

tions, used each other's logo and letterhead interchangeably, issued checks on each other's behalf, and kept business and personnel records at the same office).

Plaintiffs assert that the operations of TTU and Barnes & Noble were sufficiently interrelated for purposes of the single employer doctrine because Barnes & Noble paid TTU for the use of its building and for utilities, and because it received maintenance services from TTU. These provisions are nothing more than standard contractual lease terms, however, and do not show interrelation of operations. Other examples of interrelation, such as Barnes & Noble's relationship with TTU faculty, are simply inherent to the operation of a campus bookstore catering to the TTU community. *Cf. Evans v. McDonald's Corp.,* 936 F.2d 1087, 1090 (10th Cir.1991) (finding that franchisor did not have any control over operations of franchisee other than "the necessary control over conformity to standard operational details inherent in many franchise settings"). If this type of interrelation were sufficient to create a genuine issue of fact, there would be a genuine issue as to the first factor every time a company contracted to run a campus bookstore.

Second, there is no evidence of common management. Barnes & Noble and TTU have never shared common officers or board members. *See York,* 684 F.2d at 362. While the Agreement contained some provisions suggesting that TTU retained the ability to influence the management of the bookstore,[5] these provisions do not show that TTU and Barnes & Noble shared common management as that term has been construed in cases treating two entities as a single employer. *See, e.g., Armbruster,* 711 F.2d at 1339 (finding common management where president of one company was also director and officer of the other); *McKenzie,* 834 F.2d at 934 (companies shared common president); *Dolphin Cruise Line,* 945 F.Supp. at 1554 (companies shared common president, at least three individuals sat on board of di-

---

5. The Agreement provides that bookstore management "should meet regularly and work cooperatively with designated University officials in the development and improvement of the Book-store services and policies." J.A. at 119. In addition, TTU may request removal of the Bookstore Manager and any other management staff.

rectors of both companies, and managers of two companies assisted each other in daily operations); *Boyd v. James S. Hayes Living Health Care Agency, Inc.*, 671 F.Supp. 1155, 1164 (W.D.Tenn.1987)(first company's board selected second company's board, and first company's executive director served as board chairman of second company).

Third, there is no evidence that TTU controlled labor relations at Barnes & Noble. Only Barnes & Noble had the power to hire and fire employees. "So far as discrimination in hiring and firing on the basis of age or other forbidden characteristics is concerned, the key powers are, naturally, those of hiring and firing." *EEOC v. Illinois*, 69 F.3d 167, 171 (7th Cir.1995).

Plaintiffs point to the following clause in the Agreement:

> The Contractor will submit resumes of candidates it would recommend to the University as Bookstore Manager. The University shall review the resumes and reserves the right to conduct interviews with the candidates prior to the position being filled. Filling this critical position with the "right person" is a joint goal of the Contractor and the University. The University reserves the right to request the Contractor change the Bookstore Manager and other management staff at the University's sole discretion.

J.A. at 118. They also point out that TTU reserved the right "to require the removal of Contractor's employees from assignment on its campus for good cause." *Id.* Neither of these provisions, however, granted TTU authority to *hire* and *fire* Barnes & Noble employees. Nor is there any evidence that TTU controlled the decision to fire plaintiffs, or made any other final decision with regard to their employment. *See U.S. West*, 3 F.3d at 1363 (quoting *Trevino*, 701 F.2d at 404) ("the critical question is '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?' ").

Plaintiffs assert that TTU required Barnes & Noble to retain prior employees and dic-

tated terms of their employment, including their salaries, severance pay and their eligibility for tuition reimbursements. When Barnes & Noble entered into the contract with TTU, however, it essentially chose to hire former TTU employees on the terms contemplated in the Agreement. *See Clinton's Ditch*, 778 F.2d at 138. Once those employees became employees of Barnes & Noble pursuant to the Agreement, Barnes & Noble alone was responsible for paying their wages and benefits, and plaintiffs do not contend otherwise. Instead, they note that Barnes & Noble employees were eligible for parking permits on the same basis as TTU employees, and that they were required to adhere to federal and state law and University regulations.[6] These facts hardly show that TTU controlled the employment process at Barnes & Noble.

At most, the evidence shows that TTU had a voice in certain employment decisions at Barnes & Noble, not that it controlled those decisions in the manner seen in single employer situations. *See, e.g., Armbruster*, 711 F.2d at 1338–39 (parent company controlled labor relations of subsidiary where parent hired subsidiary president and plant manager, approved plaintiff's hiring and was involved in her termination); *Cook v. Arrowsmith Shelburne Inc.*, 69 F.3d 1235, 1241 (2d Cir.1995) (parent company approved subsidiary's personnel status reports and all its major employment decisions, and employee of parent hired and fired plaintiff, an employee of subsidiary); *Hayes*, 671 F.Supp. at 1164 (first company played substantial role in hiring employees for second company, paid those employees' wages and benefits, and was consulted in decision to fire plaintiff).

■ Finally, as to the fourth factor, there is no evidence of common ownership or financial control. "If neither of the entities is a sham then the fourth test is not met." *Wooster Brush*, 727 F.2d at 572. Here, neither of the two entities is a sham.

Examining the four factors together, it is clear that TTU and Barnes & Noble cannot

---

**6.** Although plaintiffs contend that TTU retains the right to approve Barnes & Noble job descriptions, that contention finds no support in the language of the contract, nor do plaintiffs offer any other evidence to support it.

be considered a single employer under the ADEA and/or ADA. TTU and Barnes & Noble were not "highly integrated with respect to ownership and operations." *Armbruster*, 711 F.2d at 1338. Nor did TTU maintain "an amount of participation [that] is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions." *Id.* (citations and internal quotation marks omitted). In short, there is nothing to indicate that TTU and Barnes & Noble functioned under anything other than an arm's length relationship. *See Murray*, 74 F.3d at 405 (citing *Armbruster*, 711 F.2d at 1337) (describing policy behind single employer doctrine as "the fairness of imposing liability for labor infractions where two nominally independent entities do not act under an arm's length relationship."). Thus, the district court properly found that TTU and Barnes & Noble cannot be treated as a single employer or integrated enterprise.

**B.** *Agency*

■ Plaintiffs argue, in the alternative, that TTU may be held liable for the actions of Barnes & Noble because Barnes & Noble is TTU's agent.[7] An agent is one who consents to act on behalf of another and subject to the other's control. *See* Restatement (Second) of Agency § 1 (1958). An agent within the context of the ADEA and other employment discrimination statutes must be an agent with respect to employment practices. *Deal*, 5 F.3d at 119 (citing *York*, 684 F.2d at 362); *Fike*, 514 F.Supp. at 728.

■ There is no evidence supporting plaintiffs' theory that Barnes & Noble acted

as TTU's agent. TTU did not delegate to Barnes & Noble the authority to make employment decisions on its behalf, nor did it exercise the requisite control over Barnes & Noble's employment decisions. *See Deal*, 5 F.3d at 119. Therefore, the district court properly concluded that TTU cannot be considered plaintiffs' "employer" under the ADEA and/or the ADA on the basis that Barnes & Noble was acting as its agent.

## IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

7. Because the ADEA and the ADA do not define the term "agent," we look to the common law of agency to determine whether Barnes & Noble acted as TTU's agent when it terminated plaintiffs' employment. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162 (11th Cir.1993) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986)). *Cf. Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23, 112 S.Ct. 1344, 1347–48, 117 L.Ed.2d 581 (1992) (applying common law principles of agency to determine whether an individual is an "employee" under ERISA); *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 739–41, 109 S.Ct. 2166, 2172–73, 104 L.Ed.2d

811 (1989) (applying common law principles of agency to determine whether an individual is an "employee" under the Copyright Act).

Contrary to the parties' belief, the applicable agency principles are found in the general common law of agency, not in the law of Tennessee. *See Darden*, 503 U.S. at 323 n. 3, 112 S.Ct. at 1348 n. 3; *Reid*, 490 U.S. at 740–41, 109 S.Ct. at 2172–73. *See also Jansen v. Packaging Corp. Of Am.*, 123 F.3d 490, 507 (7th Cir., 1997) (en banc) (Posner, C.J., concurring in part and dissenting in part) ("I have not found a case which suggests that liability under Title VII should depend on the agency law of the state where the dispute arose.").