Jerelle GRAY, Jerome Gray and
Garnetta Gray, Plaintiffs,

v.

McDONALD'S USA, LLC; Century Management, LLC d/b/a McDonald's, 3363 Austin Peay Highway, Memphis, Tennessee; Broadmoor Investments Corporation; Fred J. Tillman, individually and as managing member of Century Management, LLC; Chad Tillman; Tenth, Inc.; Jackson Martin, III; and John Does Numbers 1 and 2, unidentified managers of McDonald's, 3363 Austin Peay Highway, Memphis, Tennessee, Defendants.

No. 2:10–cv–2779–JPM–tmp.

United States District Court,
W.D. Tennessee,
Western Division.

May 30, 2012.

744

Carl Rutherford Wilander, Bennie Lazzara, Jr., Wilkes & McHugh, PA, Tampa, FL, Christopher M. Glaros, Children's Defense Fund, Columbus, OH, Carey Lynn Acerra, D'Army Bailey, Wilkes & McHugh, P.A., Memphis, TN, David L. Eanes, Jr., Wilkes & McHugh, PA, Little Rock, AR, for Plaintiffs.

Kristy L. Gunn, Thomas L. Henderson, Ogletree Deakins Nash Smoak & Stewart, P.C., Memphis, TN, for Defendants.

### ORDER GRANTING MCDONALD'S MOTION FOR SUMMARY JUDGMENT

JON PHIPPS McCALLA, Chief Judge.

Before the Court is Defendant McDonald's USA, LLC's ("Defendant" or "McDonald's") Motion for Summary Judgment (Docket Entry ("D.E.") 176), filed September 30, 2011. Plaintiffs Jerelle Gray, Jerome Gray, and Garnette Gray ("Plaintiffs") responded in opposition on October 17, 2011. (D.E. 185, 186 & 187.) Defendant replied on November 10, 2011. (D.E. 200.) On January 23, 2012, Plaintiffs filed supplemental materials in opposition to the Defendant's motion. (D.E. 227.) The Court held a telephonic hearing on the Defendant's motion on January 24, 2012. (D.E. 229.) On May 5, 2012, Plaintiffs again filed supplemental materials in support of their motion (D.E. 271), to which Defendants responded on May 9, 2012 (D.E. 274). For the reasons discussed below, the Court GRANTS Defendant's motion and dismisses all claims against McDonald's.

### I. Background

This case concerns the assault on Jerelle Gray ("Gray") by his supervisor, Jackson Martin III ("Martin"), while Gray was working at the McDonald's restaurant at 3363 Austin Peay Highway in Memphis, Tennessee (the "Austin Peay restaurant"). Plaintiffs have filed suit against: (1) McDonald's, the franchisor of the Austin Peay restaurant; (2) Century Management, LLC ("Century"), the entity responsible for managing the Austin Peay restaurant; (4) Chad Tillman and Fred Tillman (the "Tillmans") d/b/a Tenth Inc. ("Tenth"), both individually and as managing members of Century; and (5) Martin and three unidentified managers at the Austin Peay restaurant.

The facts surrounding Gray's assault are largely undisputed. On February 14, 2010, Gray was asked by Keun Anderson, a Second Assistant Manager at the Austin Peay restaurant, to work an overnight shift in exchange for $30.00 in cash and a free meal. (Pl.'s Resp. to Def.'s UMF (D.E. 187) ¶ 87–89.) At around 1:00 a.m., Anderson gave Gray $30.00 and left the restaurant, informing him that another manager would arrive shortly. (Id. ¶ 90.)

Martin and two other unidentified managers arrived at around 5:30 a.m. to begin their shift. At that time, Gray attempted to leave. (Id. ¶ 91.) Martin, however, did not allow Gray to leave, and apparently

became angry when Gray attempted to take the free meal that he had been promised. (*Id.* ¶ 92–93.) In fact, each time Gray grabbed a sandwich, Martin slapped the sandwich out of his hand. (*Id.* ¶ 93.) Martin eventually became so angry that he physically assaulted Gray, causing him to momentarily lose consciousness. (*Id.*) Plaintiffs allege that Martin's conduct was racially motivated. (See Pl.'s Fourth Am. Compl. ¶ 90.)

The instant motion concerns McDonald's liability as a franchisor of the Austin Peay restaurant. McDonald's is engaged in franchising restaurants throughout the United States. (Pl.'s Resp. to Def.'s UMF ¶ 1.) Defendants Fred J. Tillman and Chad Tillman, d/b/a Tenth Inc. (the "Franchisee"), operate the Austin Peay Restaurant as a McDonald's franchise. (*Id.* 12–4.) Defendant Century is a management company formed by the Tillmans to manage the day-to-day operations of their McDonald's franchise restaurants, including the Austin Peay restaurant. (*Id.* ¶ 38–39.) The Tillmans operate the restaurant pursuant to a Franchise Agreement ("the Franchise Agreement") with McDonald's, which was entered into on October 19, 1992. The Franchise Agreement lays out the rights and responsibilities of each party. (Franchise Agreement (D.E. 187–1) at 10; Pl.'s Resp. to Def.'s UMF ¶ 4–5.) Although the factual record before the Court is lengthy, the Franchise Agreement, which incorporates the Operations and Training Manual, and the Operations and Training Manual are the governing documents defining each party's duties and responsibilities with respect to the operation of the Austin Peay restaurant.[1] Both documents are discussed in further detail below.

### A. Franchise Agreement

The Franchise Agreement outlines the relationship between the parties by stating that

> [t]he foundation of the McDonald's System and the essence of this Franchise is the adherence by Licensee to standards and policies of McDonald's providing for the uniform operation of all McDonald's restaurants within the McDonald's System including, but not limited to, serving only designated food and beverage products; the use of only prescribed equipment and building layout and designs; strict adherence to designated food and beverage specifications and to McDonald's prescribed standards of Quality, Service and Cleanliness in Licensee's restaurant operation. Compliance by Licensee

---

[1]. Aside from these documents, Plaintiffs' motion refers to declarations and deposition testimony by a number of people involved in the various corporate Defendants' operations, including Fred Tilman (D.E. 176–5), store manager Neil McDole (D.E. 176–8), field operator Warren Patton (D.E. 176–9), store manager Pamela Carter (D.E. 176–10), as well as depositions from Jerelle Gray (D.E. 176–11) and Defendant Jackson Martin, III (D.E. 176–12). Plaintiffs' supplemental materials consist of performance evaluations by Warren Patton as to the performance of various stores, some of which appear to be the Austin Peay restaurant. (D.E. 217.) Although the Court has reviewed this evidence in issuing this Order, much of this evidence is immaterial because the Franchise Agreement and the Operations and Training Manual control the relationship between the Defendants and are the clearest indication of the nature of their operation. Allegations advanced as evidence of a genuine issue of fact must be material. "As the 'requirement [of the Rule] is that there be no genuine issue of *material* fact,' an 'alleged factual dispute between the parties' as to some ancillary matter 'will not defeat an otherwise properly supported motion for summary judgment.'" *Spence v. Potter*, No. 1:07–CV–00526, 2011 WL 249479, at *2 (S.D.Ohio Jan. 26, 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (alteration in original)).

with the foregoing standards and policies in conjunction with the McDonald's trademarks and service marks provides the basis for the valuable good will and wide family acceptance of the McDonald's System. Moreover, the establishment and maintenance of a close personal working relationship with McDonald's in the conduct of his McDonald's restaurant business, his accountability for performance of the obligations contained in this Franchise, and his adherence to the tenets of the McDonald's System constitute the essence of this Franchise.

(D.E. 187–1 ¶ 1(c).) The Franchise Agreement also obligates McDonald's to provide the franchisee with business manuals prepared by McDonald's, and incorporates those manuals into the agreement by reference. (*Id.* ¶ 4.) According to the Franchise Agreement, the manuals "contain detailed information including: (a) required operations procedures; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies and ... advertising, and personnel policies." (*Id.*)

The Franchise Agreement further obligates McDonald's to "make available to Licensee the services of Hamburger University, the international training center for the McDonald's system." (*Id.* ¶ 6.) In exchange, the agreement obligates the franchisee "to enroll himself and his managers, present and future, at Hamburger University or at such other training center as may be designated by McDonald's from time to time." (*Id.* ¶ 6.)

The agreement also obligates franchisees to comply with the McDonald's System. The agreement specifically obligates the franchisee to "[o]perate the Restaurant seven days per week throughout the year and at least during the hours from 7:00 a.m. to 11:00 p.m., or such other hours as may from time to time be prescribed by

McDonald's ..., maintain sufficient supplies of food and paper products, and employ adequate personnel so as to operate the Restaurant at its maximum capacity and efficiency." (*Id.* ¶ 12(g).) Furthermore, the franchisee shall "[c]ause all employees of Licensee, while working in the Restaurant, to: (i) wear uniforms of such color, design and other specifications as McDonald's may designate from time to time, (ii) present a neat and clean appearance, and (iii) render competent and courteous service to Restaurant customers." (*Id.* ¶ 12(h).) In the event of a franchisee's material breach, the agreement grants McDonald's "an immediate right to enter and take possession of the Restaurant in order to maintain continuous operation of the Restaurant, to provide for orderly change of management and disposition of personal property, and to otherwise protect McDonald's interest." (*Id.* ¶ 20(a).)

Under the Franchise Agreement, the franchisee must pay McDonald's a service fee based on a percentage of the restaurant's gross sales. (Pl.'s Resp. to Def.'s IMF ¶ 17.) McDonald's does not directly share in the profits and losses of the Austin Peay restaurant. (*Id.* ¶ 18.)

### B. Operations and Training Manual

The Operation and Training Manual (the "Manual") presents guidelines and procedures that McDonald's asks its operators to follow when operating a McDonald's restaurant. (Operations and Training Manual (D.E. 227–1).) The Manual covers a variety of subjects, including training, restaurant security, and human resources.

The Manual's training section provides steps a franchisee may take to establish an effective training program. (*Id.* ¶ at 22–67.) The Manual states that "a good training program has two benefits: It demonstrates our commitment and allows us to retain valuable team members." (*Id.* at

24.) The Manual also states that, "[b]y following the training procedures described in this chapter and by using the proper tools, you can effectively execute your training program" (*id.* at 24), and informs the operator that "[o]ther training tools are available that can help your restaurant improve QSC and the customer experience. Through an analysis of your restaurant's processes using specially designed tools, you can identify areas where additional crew and management training may be useful" (*id.* at 24.). The Manual then advises franchisors as to how to construct an effective training program by following a series of steps, including "Determin[ing] number of crew members to be trained and number of crew trainers available," "Ensur[ing] training materials are available," and "Calculat[ing] training budget." (*Id.* at 26.) The Manual also provides suggestions to aid operators in decision making. For example, the Manuel states, "Sometimes your restaurant's budget limits the hours you have available for training. When this happens, decide what is most important." (*Id.* at 26.)

The Manual's security section provides guidelines and requirements regarding security. Under the heading of "Security regulations," the Manual states that "it is McDonald's policy to maintain a workplace free of convicted criminal sex offenders," and then goes on to list resources that an operator can use to ensure that it does not hire a sex offender. (*Id.* at 31.) The Manual then describes various security risks and provides directions for managing each type of risk.

Under its human resources section, the Manual describes how an operator may increase diversity at its store, and specifically lists "[a]ctions to increase diversity in your restaurant" and "[p]ractices to avoid." (*Id.* at 52.) The Manual goes on to say that

[a]ll McDonald's restaurants must provide employees with a respectful workplace. The restaurant environment must not condone or permit any behavior that would be considered offensive or disruptive to other employees. Any such behavior must not be tolerated and must be handled with disciplinary action up to and including termination."

(*Id.* at 52.) Under the "Discrimination and harassment" heading, the Manual states that "Owner/operators are encouraged to develop and implement their own policy against discrimination and harassment," and directs the operator to "[m]ake sure all employees understand McDonald's Policy Against Discrimination and Harassment, including how to bring concerns to McDonald's attention or; *if employed by an owner/operator, to the owner/operator's attention or the appropriate person under their policy.*" (*Id.* at 53) (emphasis added). The Manual also contains a heading labeled "Terminating an employee based on policy or rule violation." (*Id.* at 62.) Under that heading, the Manual states that, "[b]efore terminating an employee for engaging in a policy or rule violation, [operators] should take the following actions." (*Id.* at 62.) Steps that the Manual asks operators to take include "[m]ak[ing] sure the employee was aware of, or should have been aware of, the policy or rule that he or she violated," "[m]ak[ing] sure you have' evidence to support your decision," and "[m]ak[ing] sure you are treating the employee consistently with others who are engaged in similar policy or rule violations." (*Id.* at 62.)

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials show that

"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make such a showing, summary judgment is appropriate. *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir.1989). In considering a motion for summary judgment, however, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party must set out specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(c); *see also Abeita v. TransAmerica Mailings, Inc.,* 159 F.3d 246, 250 (6th Cir.1998). However, " '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient.' " *Street v. J.C. Bradford & Co., Inc.,* 886 F.2d 1472, 1477 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 447 U.S. at 248, 100 S.Ct. 2124. In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 100 S.Ct. 2124.

## III. ANALYSIS

Plaintiffs' Fourth Amended Complaint' alleges ten counts against the various defendants. The following counts seek to impose liability on Defendant McDonald's: (1) Count I—negligent failure to ensure an adequately safe workplace and adequate management; (2) Count II—discriminatory practices, employment-related discrimination, and malicious harassment in violation of the Tennessee Human Rights Act (THRA); (3) Count III—discrimination in violation of 42 U.S.C. § 1981; (4) Count IV—hostile work environment in violation of 42 U.S.C. § 1981; (5) Count VII—outrage and intentional infliction of emotional distress against; (6) Count VIII—negligent infliction of emotional distress; (7) Count IX—negligent training, supervision, and discipline; and (8) Count X—premises liability.

### A. *Plaintiffs' Civil Rights Claims Against Defendant (Counts II–IV)*

McDonald's argues that Plaintiffs' civil rights claims—Counts II, III, and IV—must fail because McDonald's is not Gray's "employer" under § 1981 or the THRA.[2] *Swallows v. Barnes & Noble Book Stores, Inc.,* 128 F.3d 990, 992–93 (6th Cir.1997).

In *Swallows,* the Sixth Circuit adopted the "single employer" test as one means of determining "whether two entities are so interrelated that they may be considered a 'single employer' or an 'integrated enterprise' " and therefore liable under Title VII. *Id.* at 993. Determining whether an employer fits that definition

---

**2.** Plaintiffs concede that the analysis for their THRA and § 1981 claims is identical to the analysis under Title VII. (*See* Mem. in Supp. of Pl.'s Resp. to McDonald's USA, LCC's Mot. for Summ. J. (D.E. 186) at 3 n. 1.)

requires consideration of four factors: (1) interrelation of operations, i.e. whether the two entities have "common offices, common record keeping, shared bank accounts and equipment," *id.* at 994; (2) whether the two entities share "common management, common directors and boards," *id.* at 994; (3) whether the two entities have "centralized control of labor relations and personnel," *id.* at 995, including the power to hire and fire employees, and the power to dictate terms of employment including salaries and severance pay, *see id.* at 995; and (4) whether the two entities share "common ownership and financial control," *id.* at 995. The last prong is not met "[i]f neither of the entities is a sham." *Id.* (quoting *E.E.O.C. v. Wooster Brush Co. Emps. Relief Ass'n*, 727 F.2d 566, 572 (6th Cir.1984)).

■ In the instant case, the undisputed evidence establishes that McDonald's and Century are not "so interrelated that they may be considered a 'single employer' or an 'integrated enterprise.'" *Swallows*, 128 F.3d at 993. First, there is no evidence indicating interrelation of operations: although Century submits monthly sales reports to McDonald's (Fred Tillman Dep. 208:6–208:10, June 29, 2011 (D.E. 187–2)), the companies maintain separate bank accounts and separate offices. Second, no evidence indicates that the parties shared common management. It is undisputed that Century had its own managers and, although McDonald's employs a Field Consultant to inspect the restaurant twice per eighteen-month cycle to ensure compliance with the McDonald's system (*id.* at 214:2–215:15), the Court declines to find that such minimal supervision rises to the level of common management.

Third, although Plaintiffs provide some evidence that McDonald's provides discrimination and harassment training for Century's management-level employees, no evidence indicates that McDonald's re-

tains the ability to hire, fire, or discipline an employee. While the franchise agreement imposes several obligations on franchisees, those obligations relate to matters such as restaurant hours, supplies, and uniforms, not personnel management. (D.E. 187–1 ¶ 12(g)-(h).) Any directives relating to personnel management—including obligating franchisees to "employ adequate personnel so as to operate the Restaurant at its maximum capacity and efficiency" (*id.* ¶ 12(g)), and to ensure all employees wear uniforms, "present a neat and clean appearance," and "render competent and courteous service" (*id.* ¶ 12(h))—are far too general to constitute control rising to the level of employment. Finally, the deferential language in the McDonald's Manual—for example, instructing franchisees as to how "*you* can effectively execute *your* training program" (D.E. 227–1 at 24)(emphasis added), or "[t]hrough an analysis of *your* restaurant's processes using specially designed tools, *you* can identify areas where additional crew and management training may be useful" (*id.* at 24)(emphasis added)—indicates that McDonald's actually retained minimal control over personnel. The Manual's similarly deferential language when discussing discriminating and harassment (*id.* at 53) and termination based on rule violation (*id.* at 62) indicates that McDonald's retains minimal control over such matters.

Finally, the fourth *Swallows* prong is not met because it is undisputed that neither McDonald's nor Century is a sham entity. McDonald's is therefore not Gray's employer under *Swallows'* single employer test.

■ Plaintiffs' response asks the Court to instead apply the Sixth Circuit's common law agency test and hold McDonald's liable as Gray's employer. *See Swallows*, 128 F.3d at 993, 996 (citing *Deal v. State*

*Farm Cnty. Mut. Ins. Co. of Tex.*, 5 F.3d 117 (5th Cir.1993)). The common law agency test has two elements: (1) a right to control component, which "focuse[s] on whether the alleged employer has the right to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule," *Deal*, 5 F.3d at 119; and (2) an economic realities component, which "focuse[s] on whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment," *id.* at 119. In the instant case, there is no evidence to indicate that McDonald's hired Gray, or that it had the right to hire, supervise, or set Gray's work schedule. To the contrary, the deferential language in the Manual suggests otherwise. Accordingly, McDonald's is not Gray's employer under the common law agency test.

Plaintiffs next rely on a number of cases to argue that McDonald's is liable as Gray's employer because it cloaked Century, Gray's actual employer, with apparent authority. In the first case, *Miller v. McDonald's Corp.*, 150 Or.App. 274, 945 P.2d 1107 (1997), a patron of a fast food restaurant discovered a foreign object in her food. There, the court found that

> "[t]here is an issue of fact about whether defendant held 3K out as its agent. Everything about the appearance and operation of the Tigard McDonald's identified it with defendant and with the common image for all McDonald's restaurants that defendant has worked to create through national advertising, common signs and uniforms, common menus, common appearance, and common standards." *Id.* at 1113.

In another case, *Broock v. Nutri/System, Inc.*, 654 F.Supp. 7 (S.D.Ohio 1986), the administrator of an estate bought suit on behalf of individual who participated in franchisee's diet program before her death. There, the court based liability on deposition testimony from the deceased's husband stating that "Sharon had come to me and said she wanted to ... *lose some weight and she had read about Nutri/System and it guaranteed you lose so much weight.*" *Id.* at 11 (emphasis original). Finally, in *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156 (4th Cir.1988), plaintiffs were motel guests who had been assaulted on defendant's premises. The court found that Plaintiffs had presented a case for apparent agency because,

> [b]y virtue of the franchise agreement, [Defendant] Holiday Inns retained a significant degree of control over the operation of the Holiday Inn–Concord. This control included the use of the Holiday Inns trade name and trademarks, which appeared on numerous items in and about the motel.... We think that a jury could reasonably conclude that the Holiday Inn–Concord was operated in such a way as to create the appearance that it was owned by Holiday Inns, Inc. and that this was one of the purposes of the franchise agreement.

*Id.* at 166–67.

Although the cases that Plaintiffs cite involve franchisor liability, they are distinguishable in several important respects. First, in the instant case, Plaintiffs must establish that McDonald's was Gray's employer in order to impose liability under § 1981 and the THRA; the cases on which Plaintiffs rely, however, all seek to hold defendants liable in tort under a theory of vicarious liability. *See Miller* (products liability); *Broock* (products liability); *Crinkley* (assault). Plaintiffs' reliance is misplaced because, in the instant case, Plaintiffs must show that Defendant meets the statutory definition of "employer" under the THRA. *Cf. Swallows*, 128 F.3d at 993. Furthermore, the cases that Plaintiffs cite involve third-party plaintiffs who

have no previous relationship with the defendant. Those cases therefore focus on appearances as an indicator of agency because they involve plaintiffs who relied on the appearance of agency arguably because they had no other knowledge of the actual relationship between the franchisee and the franchisor.

The Court therefore finds that the undisputed evidence indicates McDonald's was not Gray's employer. Accordingly, the Court GRANTS summary judgment as to Gray's § 1981 and THRA claims against McDonald's.

### B. *Plaintiffs' Tort Claims Against Defendant (Counts I, VII–IX)*

McDonald's argues that it cannot be held vicariously responsible for the injuries that Martin inflicted on Gray because it did not exercise control over the aspects of the restaurant that allegedly gave rise to Gray's injuries—that is, it did not control the hiring, firing, and discipline of Martin or any other Century employee. In response, Plaintiffs argue that the fact that McDonald's mandated training for managers, including obligating franchisees to send managers to Hamburger University and requiring staff to attend race discrimination and diversity training, demonstrates that it retained sufficient control over Martin to be held liable for Gray's injuries.

 The predominant test for holding a franchisor liable for the tortious conduct of its franchisee Is whether the franchisor "control[s] or ha[s] the right to control the daily conduct or operation of the particular 'instrumentality' or aspect of the franchisee's business that is alleged to have caused the harm." *Kerl v. Dennis Rasmussen, Inc.*, 273 Wis.2d 106, 682 N.W.2d 328, 340 (2004). In *Kerl*, the court noted in dicta that "[t]he quality and operational standards typically found in franchise agreements do not establish the sort of close supervisory control or right to con-

trol necessary to support imposing vicarious liability on a franchisor for the torts of the franchisee for all or general purposes." *Id.* at 340. The court further stated that
> although franchise agreements typically impose detailed requirements on the franchisee's operations ... the existence of these contractual requirements does not mean that franchisors have a role in managing the day-to-day operations of their franchisees. To the contrary, the imposition of quality and operational requirements by contract suggests that the franchisor does not intervene in the daily operation and management of the independent business of the franchisee.

*Id.* at 337–38. In the instant case, the relevant inquiry is whether McDonald's could control the essential terms of Martin's employment—that is, whether it had the right to hire, fire, and discipline Martin. No evidence indicates that McDonald's had any control over the hiring, firing, or discipline of Martin. McDonald's is therefore not vicariously responsible for Martin's tortious conduct.

 McDonald's next argues that it cannot be held directly liable for Gray's injuries because it assumed no duty of care to Gray. In response, Plaintiffs argue that the fact that McDonald's mandated training for managers and retains some control over inspection of the restaurant indicates that it undertook a voluntary duty of care towards Century's employees.

 Whether a franchisor assumes a voluntary duty to a franchisee's employee turns on whether the franchisor retains sufficient control over the day-to-day operations giving rise to the employee's injury. *See Bricker v. R & A Pizza, Inc.*, 804 F.Supp.2d 615, 623 (S.D.Ohio 2011) ("Without any factual averments supporting either the claim that Domino's acted as the Brickers' employer or that their actual employer was Domino's agent (and not just

its franchisee), no special relationship could be inferred that would give rise to a duty of care owed by Domino's to the Brickers, at least with respect to either the hiring, retention, or supervision of Mr. Mentzer...."); *Barnett v. Ludwig & Co.*, 355 Ill.Dec. 840, 960 N.E.2d 722, 738 (Ill. App.Ct.2011) ("[W]hether a franchisor maintains mandatory security procedures is a crucial factor in determining whether the franchisor has voluntarily undertaken a duty of care toward a franchisee's employees." (quoting *Lawson v. Schmitt Boulder Hill*, 398 Ill.App.3d 127, 338 Ill. Dec. 297, 924 N.E.2d 503 (2010))); *Folsom v. Burger King*, 135 Wash.2d 658, 958 P.2d 301, 309 (1998) ("In order to retain sufficient control, a franchisor must retain the ability to make decisions concerning the daily operation of the franchised restaurant.... [P]laintiffs have not shown Burger King retained control over the security of the franchise restaurant. Burger King's authority over the franchise was limited to enforcing and maintaining the uniformity of the Burger King system."). As previously discussed, no evidence in the record indicates that McDonald's retained any control over the hiring, firing, or discipline of any of Century's employees. To the contrary, McDonald's Operations Manual merely suggests methods that operators could employ in effectively managing their personnel, which suggests a lack of direct control.

Plaintiffs in response rely on *Lawson v. Schmitt Boulder Hill*, 398 Ill.App.3d 127, 338 Ill.Dec. 297, 924 N.E.2d 503 (2010). In *Lawson*, a franchisee's employee was robbed, attacked, and assaulted in the franchisor's parking lot. The court stated that "[the] allegations ... establish that ... McDonald's mandated compliance with security procedures. [Previous case law] illustrate[s] that whether a franchisor maintains mandatory security procedures is a crucial factor in determining whether the franchisor has voluntarily undertaken

a duty of care toward a franchisee's employees." *Id.*, 338 Ill.Dec. 297, 924 N.E.2d at 509. Plaintiffs' reliance, however, is misplaced because the undisputed evidence indicates that McDonald's did not exercise control over the hiring, firing, or disciplining of Century's employees. In contrast, in *Lawson*, McDonald's mandated strict compliance with its security procedures. In the instant case, therefore, McDonald's did not assume a voluntary duty to protect Gray against Martin's assault.

The Court therefore finds that the undisputed evidence shows that McDonald's cannot be held either vicariously or directly liable for Gray's injuries. Accordingly, the Court GRANTS summary judgment as to Gray's tort claims against McDonald's.

### C. *Plaintiffs' Premises Liability Claim Against Defendant (Count X)*

In their Fourth Amended Complaint, Plaintiffs frame Gray's assault as an injury arising from a dangerous condition on the premises. In its motion, McDonald's argues that, as the lessor of the restaurant's location, it cannot be held liable under Tennessee law for allegedly dangerous conditions at the Austin Peay restaurant. In response, Plaintiffs argue that Tennessee law imposes upon McDonald's a continuing duty to maintain the premises in a safe condition, which includes ensuring the safety of Gray, who was a business invitee.

■■■ In Tennessee, a landlord is generally not liable for harm caused by a dangerous condition on the premises. *Lethcoe v. Holden*, 31 S.W.3d 254, 256 (Tenn.Ct.App.2000). A landlord may be held liable, however, if: "(1) the dangerous condition was in existence at the time the lease was executed; (2) the landlord knew or should have known of the dangerous condition; and (3) the tenant did not know of the condition and could not have learned

about it through the exercise of reasonable care." *Jones v. Jenkins,* No. M2008–01911–COA–R3–CV, 2009 WL 1871868 at *3–4 (Tenn.Ct.App. June 29, 2009).

■■■ In the instant case, the property on which the Austin Peay restaurant is located is owned by Broadmoor Investments Corp. ("Broadmoor"). (Pl.'s Resp. to Def.'s UMF ¶ 84.) Under a ground lease executed on October 21, 1971, Broadmoor leases the premises to McDonald's who, in turn, leases the property to the Tillmans under an agreement executed on October 25, 1992. (Pl.'s Resp. to Def.'s UMF ¶ 85–86.) McDonald's therefore functions in the role of a landlord with respect to Century.

None of the factor leading to liability are met in the instant case. First, the dangerous condition—Martin—did not exist at the time the lease was executed because, while Martin was hired in April 2006, the lease for the premises was executed on October 25, 1992. Second, there is no evidence in the record indicating that McDonald's knew or should have known about Martin's propensities because there Is no evidence to indicate that McDonald's retained sufficient control over the employment of its franchisee's employees. Finally, as to the third factor, although there is no evidence in the record that Century knew of Martin's violent propensities, Century was arguably in a far better position to discover these characteristics than McDonald's.

Plaintiffs rely on *Roberts v. Tenn. Wesleyan Coll.,* 60 Tenn.App. 624, 450 S.W.2d 21, 25–26 (1969), to argue that, under Tennessee law, a landlord has a continuing obligation to maintain the premises. *Roberts,* however, is highly distinguishable. In that case, plaintiff had leased premises from Tennessee Wesleyan College, and for a stated amount of rent, was allowed to use the auditorium to rehearse and present her dance students for their year-end recital. The College retained control of the entrance to the lobby of the auditorium because it was being used by administrative personnel whose offices were in the building. The Court stated,

> [W]here a landlord retains control over the only passageway leading to leased premises, he is obligated to exercise reasonable care to keep the passageway in a reasonably safe condition for the use of his tenant and others using the passageway with the consent of the tenant—whether such persons are classed as licensees or invitees—and is liable to the tenant and those using the passageway with the consent of the tenant for any harm that results from his (the landlord's) failure to perform the duty owed.

*Id.* at 25 (emphasis added). In contrast, for the reasons previously stated in this Order, there is no evidence in the instant case that McDonald's retained control over the specific aspect of the premises leading to the harm—that is, the employment of Martin.

The Court finds that no evidence in the record subjects McDonald's to premises liability as the landlord of the Austin Peay restaurant. The Court therefore GRANTS summary judgment as to Count X of Plaintiffs' Fourth Amended Complaint.

### D. *Tennessee Worker's Compensation Act*

Defendant McDonald's argues that, even if the Court holds that a genuine issue of material fact exists as to whether McDonald's retained sufficient control over its franchisee's employees to subject itself to liability, Grey's injuries are barred by the Tennessee Worker's Compensation Act (TWCA). Having found no genuine issue of material fact as to whether McDonald's retained sufficient control to subject itself

to liability, the Court declines to reach the issue of whether the TWCA is the exclusive remedy for Gray's claims.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.